[L. A. No. 29458. In Bank. Jan. 26, 1968.]

BERNARD J. ENDLER, Plaintiff and Appellant, v. JERALD S. SCHUTZBANK, as Commissioner of Corporations, etc., Defendant and Respondent.

Ellis J. Horvitz for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, and H. Warren Siegel, Deputy Attorney General, for Defendant and Respondent.

TOBRINER, J.—After nearly 15 years in the finance business, plaintiff finds himself unable to obtain employment in his chosen field because the Commissioner of Corporations, having labelled him a criminal on the basis of unproved accusations, threatens disciplinary action against anyone who might employ him. Plaintiff seeks an opportunity to confront his accusers and to defend his innocence; he urges that, until his guilt has been adjudicated in proper proceedings, the Constitution guarantees his right to pursue a lawful occupation unburdened by an official badge of criminality. We hold that the alleged conduct of the commissioner, rendering the plaintiff unemployable without affording him a full hearing on the charges against him, transgresses the fundamental principle that the state may deprive no man of liberty or property without due process of law. Accordingly, we conclude that the plaintiff has stated a case for declaratory and injunctive relief and that the trial court erred in dismissing his complaint upon the commissioner's general demurrer.

I

Given the procedural posture of this case, we must accept as accurate the factual allegations of plaintiff's complaint. (*Rosenfield* v. *Malcolm* (1967) 65 Cal.2d 559, 563 [55 Cal.Rptr. 505, 421 P.2d 697]; *Stanton* v. *Dumke* (1966) 64 Cal.2d 199, 201 [49 Cal.Rptr. 380, 411 P.2d 108]; *Stigall* v. *City of Taft* (1962) 58 Cal.2d 565, 567-568 [27 Cal.Rptr. 441, 375 P.2d 289]; *Flores* v. *Arroyo* (1961) 56 Cal.2d 492, 497 [15 Cal.Rptr. 87, 364 P.2d 263].) For present purposes, therefore, we treat the following facts as undisputed:

For 14½ years prior to November 1965, plaintiff was employed by various financial institutions in California. He has earned his livelihood almost exclusively in the finance business and his ability to support his family will be seriously impaired unless he is permitted to hold a position with a personal property broker licensed by the state.[1]

In mid-November 1964, plaintiff secured such a position as office manager for Huntington Finance Corporation. At some time prior to mid-September 1965, the commissioner informed Huntington that one of plaintiff's former employers had charged him with forgery and embezzlement and that, unless Huntington would terminate plaintiff's employment, the commissioner would take steps to revoke or suspend Huntington's license as a personal property broker. At the time the commissioner so notified Huntington, his office had undertaken no independent investigation of the accusations lodged against plaintiff. Plaintiff requested an opportunity to present evidence in his own behalf, but the commissioner refused at that time to hold a hearing of any kind.

Huntington informed the commissioner that plaintiff was a "capable, conscientious and thoroughly honest employee" who had been "of great assistance to the company" and that the employer who had allegedly accused the plaintiff of wrongdoing had told Huntington that plaintiff was a "very honest man and . . . a good worker and well versed in the finance business." Huntington concluded that "it would [therefore] be unconscionable of us to dismiss [plaintiff] on the basis of your verbal request, unsupported by independent investigation, and based upon charges made by a man who had previously given [plaintiff] a warm recommendation." Huntington added: "If we were to comply with your request, and each new employer were to do likewise [plaintiff] would be forever barred from employment in his chosen field without ever being given a hearing or a chance to clear his name. We consider this to be fundamentally at odds with his basic

---

[1]Such brokers include "all who are engaged in the business of lending money and taking . . . , as security for such loan, any contract or obligation involving the forfeiture of rights in or to personal property, the use and possession of which property is retained by other than the mortgagee or lender, or any lien on, assignment of, or power of attorney relative to wages, salary, earnings, income, or commission." (Fin. Code, § 22009.) Subject to several enumerated exceptions (§§ 22050-22053), all personal property brokers must obtain a license from the Commissioner of Corporations (§ 22200).

rights. We do not think it is the proper way to treat a trusted employee who has rendered faithful and effective service on our behalf.''

Several weeks after Huntington addressed this communication to him, the commissioner instituted proceedings to revoke Huntington's license because of its refusal to discharge plaintiff. Although Huntington resisted the commissioner's attempt, its efforts proved futile. Huntington was purchased by State Loan and Finance Management Corporation. Unwilling to risk the commissioner's disfavor, State Loan terminated plaintiff's employment in early November 1965. Two weeks later, the commissioner dismissed the proceedings against Huntington's successor.

Shortly thereafter, the commissioner offered to conduct an ''informal hearing'' on the charges urged against plaintiff ''with the understanding that said informal hearing was not undertaken pursuant to any specified statute or statutory authority, was not to be in accordance with administrative procedures applicable to formal hearings, and would be without prejudice to the rights of the parties thereto.'' The commissioner indicated that, unless he were favorably disposed after such a hearing, he ''would continue to threaten disciplinary action against any . . . licensees who employed plaintiff.'' Plaintiff did not agree to subject himself to the proposed proceeding.

The commissioner then embarked upon a policy of ''directing its licensees . . . not to employ plaintiff on threat of revocation or suspension of their personal property broker's license'' with the result that ''it has become impossible for plaintiff to obtain employment anywhere in the State of California with a licensed personal property broker or with any other licensee of the office of the Commissioner of Corporations.''

Alleging that he would suffer irreparable injury if the commissioner were permitted to persist in directing others not to employ him, the plaintiff sought declaratory, injunctive, and mandatory relief, together with whatever other relief the court might deem proper. The commissioner demurred on the ground that the complaint failed to state facts sufficient to constitute a cause of action. In June 1966, the trial court sustained the demurrer without leave to amend and ordered plaintiff's action dismissed. Plaintiff then instituted this appeal.

## II

At the threshold, we are met by the Attorney General's contention that, having failed to exhaust the administrative remedy offered to him in late 1965, plaintiff cannot now seek judicial protection. The argument does not require extended discussion. We have recently held that an opportunity for administrative review does not constitute the sort of "remedy" which a party must exhaust before invoking the assistance of the courts unless the statute or regulation under which such review is offered "establishes clearly defined machinery for the submission, evaluation and resolution of complaints by aggrieved parties." (*Rosenfield* v. *Malcolm, supra,* 65 Cal.2d at p. 566; see the cases discussed at pp. 566-567; see also *People* v. *Broad* (1932) 216 Cal. 1, 7-8 [12 P.2d 941].)

We recognize that the issue in *Rosenfield* turned on whether or not a well-defined remedy *existed,* whereas in the instant case a remedy of sorts *was* offered. The commissioner, however, proposed only a manifestly defective "hearing." Without pausing to consider its more technical shortcomings,[2] we need only recall that the commissioner suggested a hearing that would be "without prejudice to the rights of the parties" and that would bind the commissioner only at his own discretion. Thus, if the hearing confirmed the commissioner's suspicions, he would continue to induce brokers not to hire the plaintiff; if the hearing vindicated the plaintiff's claims of innocence, the commissioner reserved the right to disregard it and to proceed as though the plaintiff had been found guilty. However we might view the niceties of the exhaustion of remedies doctrine, we cannot reconcile the Fourteenth Amendment's requirement of due process with this sort of heads-I-win, tails-you-lose procedure.

## III

Having passed the exhaustion hurdle, we come to the Attorney General's suggestion that "the sole issue in this case is whether a licensee may be disciplined for . . . employing a person whose acts indicate he is unqualified to be a loan company manager." We have no doubt that such discipline falls

---

[2]Among other things, the commissioner indicated that his hearing would not comply with the requirements of the Administrative Procedure Act. The plaintiff could therefore assume that the hearing would be lacking in at least some of the safeguards which this court has held mandatory in disciplinary proceedings. (See, e.g., *Shively* v. *Stewart* (1966) 65 Cal.2d 475, 479 [55 Cal.Rptr. 217, 421 P.2d 65].)

well within the commissioner's statutory authority,[3] but that is *not* the issue currently before us. On the contrary, the issue here is whether the commissioner may permanently bar the plaintiff from employment in his chosen field on the basis of partially investigated charges without ever affording the plaintiff an opportunity to be heard in a formal proceeding accompanied by the safeguards ordinarily required by due process of law.

In approaching this question, we note at the outset that the Fourteenth Amendment protects the pursuit of one's profession from abridgment by arbitrary state action.[4] We

---

[3]Although plaintiff maintains that the Personal Property Brokers Law (Fin. Code, §§ 22000-22653) does not authorize the Commissioner of Corporations to suspend or revoke a corporate license for the misconduct of its office manager, we have concluded that plaintiff's position in this regard lacks merit. The commissioner may revoke a license if he finds that any "fact or condition exists which, if it had existed at the time of the original application for such license reasonably would have warranted the commissioner in refusing originally to issue the license." (§ 22615, subd. (c).) Plaintiff relies heavily upon the fact that section 22206 of the Financial Code, governing the original issuance of the license, authorizes the denial of a license to a corporation whose "officers and directors" are not of such experience and character as to command confidence in their honesty and efficiency. We do not consider the failure to mention "managers" determinative.

First, a corporate manager is often regarded as one of its "officers." (See, eg., *Stockton Lbr. Co.* v. *Blodgett* (1906) 3 Cal.App. 94, 95 [84 P. 441].)

Second, since the commissioner may require information about the manager of a license applicant (§ 22201, subd. (b), the Legislature must have intended to empower the commissioner to deny a license (§ 22206) upon finding a manager unqualified—and therefore to revoke a license (§ 22615, subd. (c)) upon the same ground.

Third, the commissioner "may make general rules and regulations . . . for the enforcement of [the Personal Property Brokers Law], in addition to, and within the general purposes of [that law]." (§ 22400.) Pursuant to this authority, the commissioner has promulgated a regulation which specifically provides that the misconduct of any *employee* of a finance company "shall be grounds for suspension or revocation of [its] license . . . ." (Cal. Admin. Code, tit. 10, § 1440.) Since there can be no doubt as to the commissioner's power to enact the regulation in question (see section 22615, subd. (a)), it furnishes a basis for license suspension or revocation independent of section 22615, subdivision (c), and hence independent of the categories of corporate personnel enumerated in section 22206.

[4]It has long been recognized that the "right to follow any of the common occupations . . . is . . . a large ingredient in the civil liberty of the citizen." (*Allgeyer* v. *Louisiana* (1897) 165 U.S. 578, 589-590 [41 L.Ed. 832, 835-836, 17 S.Ct. 427], quoting from *Butchers' Union etc. Co.* v. *Crescent City etc. Co.* (1884) 111 U.S. 746, 762 [28 L.Ed. 585, 588-589, 4 S.Ct. 652] (concurring opinion); see *Smith* v. *Texas* (1914) 233 U.S. 630, 636 [58 L.Ed. 1129, 1132, 34 S.Ct. 681, L.R.A. 1915D 677]; *Blumenthal* v. *Board of Medical Examiners* (1962) 57 Cal.2d 228, 235-236 [18 Cal.Rptr. 501, 368 P.2d 101]; cf. *Yick Wo* v. *Hopkins* (1886) U.S. 356, 368-370 [30 L.Ed. 220, 225-226, 6 S.Ct. 1064].)

therefore begin with the settled proposition that a "[s]tate cannot exclude a person from . . . any . . . occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. [Footnote and citations omitted.]" (*Schware* v. *Board of Bar Examiners* (1957) 353 U.S. 232, 238-239 [1 L.Ed.2d 796, 801-802, 77 S.Ct. 752, 64 A.L.R.2d 288]; *Konigsberg* v. *State Bar* (1957) 353 U.S. 252 [1 L.Ed.2d 810, 77 S.Ct. 722]; *Slochower* v. *Board of etc. Education* (1956) 350 U.S. 551 [100 L.Ed. 692, 76 S.Ct. 637]; *Wieman* v. *Undegraff* (1952) 344 U.S. 183 [97 L.Ed. 216, 73 S.Ct. 215]; *Blumenthal* v. *Board of Medical Examiners, supra,* 57 Cal.2d 228 [18 Cal. Rptr. 501, 368 P.2d 101].)

 Although the state may of course regulate the qualifications of individuals employed by licensed business establishments and may discipline those licensees who jeopardize the public welfare by their hiring practices,[5] the state must proceed within the limits of procedural due process in its exercise of such power. We are thus concerned here not with the *ends* which might justify governmental restrictions upon the right to follow a chosen profession but only with the *means* which government must employ in enforcing admittedly permissible restraints.

 · The contours of due process in this connection are not always the same. As the court noted in *Cafeteria & Restaurant Workers Union* v. *McElroy* (1961) 367 U.S. 886, 895 [6 L.Ed.2d 1230, 1236, 81 S.Ct. 1743], "The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. . . . [C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the governmental function involved as well as of the private interest that has been affected by governmental action."

In *Cafeteria Workers,* the court upheld the revocation without a hearing on a security clearance which a cook needed in order to retain her job at a naval institution. Less than two years later, in *Willner* v. *Committee on Character* (1963) 373 U.S. 96 [10 L.Ed.2d 224, 83 S.Ct. 1175], the court reversed

---

[5]Compare, e.g., *O'Reilly* v. *Board of Medical Examiners* (1967) 66 Cal.2d 381 [58 Cal.Rptr. 7, 426 P.2d 167]; *Doyle* v. *Board of Barber Examiners* (1963) 219 Cal.App.2d 504 [33 Cal.Rptr. 349]; *Presto* v. *Alcoholic Beverage Control etc. Board* (1960) 179 Cal.App.2d 262 [3 Cal.Rptr. 742].

the action of New York in refusing without a hearing to admit an applicant to its bar association. The court held in *Willner* that procedural due process required "confrontation and cross-examination of those whose word deprives a person of his livelihood" (373 U.S. at p. 103 [10 L.Ed.2d at p. 229]) as well as "notice of and a hearing on the grounds for his rejection." (*Id.*, at p. 105 [10 L.Ed.2d at p. 230].)

A comparison between the facts of the present case, those of *Cafeteria Workers,* and those of *Willner,* furnishes a useful point of departure. The "governmental function" involved in *Cafeteria Workers,* unlike that involved in *Willner* and in the instant case, entailed "not the power to regulate or license, as lawmaker, an entire trade or profession . . . but, rather [the power], as proprietor, to manage the internal operation of an important federal military establishment." (367 U.S. at p. 896 [6 L.Ed.2d at pp. 1236-1237].) [6] At the same time, the interest affected by the official action taken here and in *Willner* was nothing less than "the right to follow a chosen trade or profession" (367 U.S. at pp. 895-896 [6 L.Ed.2d at pp. 1236-1237]), whereas "All that was denied [in *Cafeteria Workers*] was the opportunity to work at one isolated and specific military installation." (367 U.S. at p. 896

---

[6]The underlying distinction between government's power to limit the rights of public employees and the lesser power to restrict liberty in the private sector finds expression in numerous areas of the law. Thus, for example, the Supreme Court recently held, 5-4, that statements elicited from police officers under the threat of dismissal may not be employed in subsequent criminal proceedings against such officers (*Garrity* v. *New Jersey* (1967) 385 U. S. 493 [17 L.Ed.2d 562, 87 S.Ct. 616]) and that lawyers may not be disbarred for asserting the privilege against self-incrimination (*Spevack* v. *Klein* (1967) 385 U.S. 511 [17 L.Ed.2d 574, 87 S.Ct. 625]). Justice Fortas, who cast the decisive vote with the majority in both cases, distinguished in a concurring opinion "between a lawyer's right to remain silent and that of a public employee who is asked questions specifically, directly, and narrowly relating to the performance of his official duties . . . ." (385 U.S. at p. 519 [17 L.Ed.2d at p. 580].) Although Justice Fortas agreed that testimony given in response to such questions should be excluded as "coerced" in subsequent criminal proceedings (*Garrity* v. *New Jersey, supra,* 385 U.S. 493), he drew a line between the power of the state to condition the policeman's continued employment upon his cooperation in properly limited investigations and the power of the state to compel similar cooperation on the part of an attorney, noting that the latter "is not an employee of the State" and "does not have the responsibility of an employee to account to the State for his actions because he does not perform them as agent of the State." (*Id.*, at p. 520 [17 L.Ed.2d at p. 580].)

Our recent exploration of the substantive constitutional protections available to public employees (*Bagley* v. *Washington Township Hosp. Dist.* (1966) 65 Cal.2d 499 [55 Cal.Rptr. 401, 421 P.2d 409]; *Rosenfield* v. *Malcolm, supra,* 65 Cal.2d 559) thus furnishes *a fortiori* support for our present inquiry into the procedural safeguards which the Constitution accords to persons privately employed.

[6 L.Ed.2d at p. 1236]; cf. 373 U.S. at p. 103 & fn. 2 [10 L.Ed.2d at p. 229].)

Thus the breadth of the power which government here exercises, as well as the magnitude of the private interest which it impairs, clearly distinguish this case from *Cafeteria Workers*. The rule which governs the situation before us must instead be that which the court deemed controlling in *Willner*: Procedural due process requires notice, confrontation, and a full hearing whenever action by the state significantly impairs an individual's freedom to pursue a private occupation. (373 U.S. at pp. 103-106 [10 L.Ed.2d at pp. 229-231].) [7]

Indeed, even in cases touching the national security, the United States Supreme Court has construed legislation in such a way as to preserve these due process safeguards whenever their disregard might lead to the arbitrary abridgment of the right to practice one's profession. (See *Greene* v. *McElroy* (1959) 360 U.S. 474, 507 [3 L.Ed.2d 1377, 1396-1397, 79 S.Ct. 1400], holding improper a revocation of an engineer's security clearance without full hearing; cf. *Parker* v. *Lester* (9th Cir. 1955) 227 F.2d 708, 715-721.) As the court said in *Greene*, "Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots." (Footnote omitted.) (360 U.S. at p. 496 [3 L.Ed.2d at pp. 1390-1391].)

In varying contexts, this court has not hesitated to give full effect to the principles set forth in *Greene* and applied in *Willner*. (See, e.g., *Shively* v. *Stewart, supra,* 65 Cal.2d 475, 479; *Sokol* v. *Public Utilities Com.* (1966) 65 Cal.2d 247, 254-

---

[7]See also *Goldsmith* v. *United States Board of Tax Appeals* (1926) 270 U.S. 117, 123 [70 L.Ed. 494, 497, 46 S.Ct. 215], holding that a certified public accountant could not be rejected for practice before the Board of Tax Appeals without such "notice, hearing and opportunity to answer . . . as would constitute due process." (See, generally, Davis, *The Requirement of a Trial-Type Hearing* (1956) 70 Harv.L.Rev, 193.)

256 [53 Cal.Rptr. 673, 418 P.2d 265]; *Fascination, Inc.* v. *Hoover* (1952) 39 Cal.2d 260, 269-270 [246 P.2d 656].) Indeed, we have held that even an organization, such as a labor union, which does not exercise state power cannot arbitrarily impair the right to pursue a lawful trade by expelling a member without a fair hearing (*Cason* v. *Glass Bottle Blowers Assn.* (1951) 37 Cal.2d 134, 143-144 [231 P.2d 6, 21 A.L.R.2d 1387]) or by arbitrarily excluding from membership a person employed in the craft or industry whose employees are represented by that union (*Directors Guild of America, Inc.* v. *Superior Court* (1966) 64 Cal.2d 42, 50-55 [48 Cal.Rptr. 710, 409 P.2d 934]). We thus reaffirm an elementary requirement of justice when we hold, as we do here, that the state may not make a man an outcast in his own profession without affording him a full opportunity to present his defense.

## IV

The Attorney General nonetheless asks us to countenance the state action challenged in this case on the theory that the commissioner's conduct does not automatically foreclose the plaintiff's right to work in his chosen field. As the Attorney General conceives of the situation, the commissioner is merely "advising" licensed brokers that he regards the plaintiff as unqualified to be a loan company manager and that licensees who hire him in that capacity will thereby subject themselves to disciplinary proceedings. In response to such "advance notice of . . . the position of the Commissioner in this regard," a licensee "may either discharge or refuse to hire the [plaintiff] or it may refuse to comply with the Commissioner's demand and face discipline. The choice is a free one." Thus, since the plaintiff's employment ultimately rests upon the will of those who are in a position to hire him, the plaintiff cannot blame his plight upon the commissioner and, through him, upon the state.

Moreover, the commissioner has not instituted formal proceedings of any kind against the plaintiff in the instant case; any damage which he suffers, according to the Attorney General, must therefore be viewed as merely "incidental" to lawful process directed towards licensed loan companies. For these reasons, the Attorney General suggests, this plaintiff's exclusion from his chosen profession cannot be compared to the exclusion of persons whose employment the government directly and formally prohibits by the denial or revocation of a license, permit, or other official authorization. Thus, the Attorney General concludes, the line of cases culminating in

*Willner* does not control the matter presently before this court.[8]

We find the Attorney General's argument untenable. Indeed, the Attorney General of Arizona urged precisely the same position before the Supreme Court in *Truax* v. *Raich* (1915) 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7]. With only Justice McReynolds dissenting (on other grounds), the court unqualifiedly rejected the Attorney General's contentions. *Truax* involved an Arizona statute making it a crime for any company with over five employees to fill more than 20 percent of its labor force from the ranks of aliens; the law penalized violating employers but imposed no sanctions whatever upon employees so long as they did not conceal their nationality. An Austrian-born cook sought an injunction to prevent state officers from enforcing the statute against his employer, who had threatened to discharge him in order to avoid prosecution under the statute. The Supreme Court thought it beyond dispute "that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure" (239 U.S. at p. 41 [60 L.Ed. at p. 135]), and the court had no doubt that any restriction upon such freedom on grounds of nationality violated the equal protection clause (*id.* at pp. 41-43 [60 L.Ed. at pp. 135-136]); the real controversy centered upon the plaintiff's standing to complain of the state's threatened action against his employer.

The Attorney General of Arizona suggested in *Truax,* as our Attorney General intimates here, that the plaintiff lacked standing to object to threatened proceedings against an employer and that, in any event, the state could not be blamed for the employer's decision to discharge his employee, since the relationship in question was terminable at the employer's will. The court responded: "It is . . . urged that the . . . servant cannot complain for the master, and that it is the master who is subject to prosecution, and not the complainant. But the act undertakes to operate directly upon the employment of aliens and if enforced would compel the employer to

---

[8]The Attorney General states that "Endler . . . is not being denied a license by the state, in which case he would be entitled to a hearing. There is no provision [in the rules promulgated by the commissioner] for licensing managers of loan companies." But as we said in a related setting a short time ago, "The ultimate boundaries of plaintiff's rights are set not by the rules of the [California Commissioner of Corporations] but by the Constitution of the United States." (*Rosenfield* v. *Malcolm, supra,* 65 Cal.2d 559, 562.)

discharge a sufficient number of his employes to bring the alien quota within the prescribed limit. It sufficiently appears that the discharge of the complainant will be solely for the purpose of meeting the requirements of the act and avoiding threatened prosecution under its provisions. It is, therefore, idle to call the injury indirect or remote." (*Id.*, at pp. 38-39 [60 L.Ed. at p. 134].)

In this case, as in *Truax*, the fact that plaintiff's employment rests upon the will of private parties cannot absolve the state of ultimate responsibility for his discharge and for his alleged inability to secure another position as a loan company manager. And here, no less than in *Truax*, the fact that the government's threats are addressed to plaintiff's employers rather than to plaintiff himself cannot obscure the immediate and devastating impact of those threats upon the plaintiff's ability to obtain a job.[9]

---

[9]*Truax* represents a surprisingly early precedent for the proposition, increasingly important in contemporary constitutional adjudication, that the state bears responsibility for private conduct which it encourages. (See, e.g., *Reitman* v. *Mulkey* (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627]; *Evans* v. *Newton* (1966) 382 U.S. 296, 306 [15 L.Ed.2d 373, 381, 86 S.Ct. 486] (White, J., concurring); *Anderson* v. *Martin* (1964) 375 U.S. 399, 402-403 [11 L.Ed.2d 430, 432-433, 84 S.Ct. 454]; *Lombard* v. *Louisiana* (1963) 373 U.S. 267, 273 [10 L.Ed.2d 338, 342, 83 S.Ct. 1122]; *Burton* v. *Wilmington Parking Authority* (1961) 365 U.S. 715, 726-727 [6 L.Ed.2d 45, 52-53, 81 S.Ct. 856] (Stewart, J., concurring).)

Broadly speaking, these cases, like *Truax*, illustrate the general principle that "A may complain that B has improperly [induced] C to abstain from relations with him: the common law protects A's interest in C's freedom to deal with him. The mere fact that C, left to his own devices, may have declined to deal with A does not . . . negative the possibility of legal wrong to A in a case where C's freedom to deal with A is impaired by B's action. . . . These terms can perhaps be transposed, by analogy, to the administrative scene, with the Commission cast in the role of B . . . ." (Jaffe, Judicial Control of Administrative Action (1965) 512.)

Thus, on the authority of *Truax*, a private school (A) was allowed to enjoin enforcement of a statute of Oregon (B) requiring parents (C) to send their children to public schools, and thereby interfering with the business of the private school (*Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 535-536 [69 L.Ed. 1070, 1078, 45 S.Ct. 571, 39 A.L.R. 468]) and a broadcasting network (A) was permitted to enjoin enforcement of regulations of the Federal Communications Commission (B) exposing radio stations (C) who renew their network contracts to the prospect of license revocation, thus threatening the contractual relationships of the network. (*Columbia Broadcasting System, Inc.* v. *United States* (1942) 316 U.S. 407, 422-424 [86 L.Ed. 1563, 1573-1575, 62 S.Ct. 1194]; see discussion in Jaffe, *op. cit. supra*, at pp. 512-513, especially fn. 47; see also *Terrace* v. *Thompson* (1923) 263 U.S. 197, 214-216 [68 L.Ed. 255, 273-275, 44 S.Ct. 15].)

In these situations, A's standing to complain of B's improper inducement to C rests upon a legally cognizable injury to A's interest in the

The present case of course differs from *Truax* in several respects: The plaintiff here challenges administrative rather than legislative action; he objects to that action upon procedural rather than substantive grounds; and he seeks to prevent interference with future business relationships rather than to preserve an existing position. These differences, however, provide no rational basis upon which to posit a different result.

Indeed, the *Truax* principle has already found application in several Supreme Court decisions which overturned *administrative* action on *procedural* grounds at the behest of those whose *future activities* would otherwise have been curtailed by official acts formally directed at others. Thus, for example, in *Joint Anti-Fascist Refugee Committee* v. *McGrath* (1951) 341 U.S. 123 [95 L.Ed. 817, 71 S.Ct. 624], the Attorney General of the United States had disseminated a list of supposedly subversive organizations. Three associations complained that their inclusion in such a list interfered with their ability to carry on their lawful business; they alleged, among other things, that they had lost supporters and members, particularly among those whose continued employment by the federal government would be jeopardized by membership in a listed organization. Relying upon such indirect economic injury to establish their standing to sue, the associations asked that their names be stricken from the Attorney General's list on the ground that they had not been given a hearing as to their subversive character.

The members of the court agreed on little else, but the six justices who voted to uphold the claims of the association all concurred in holding that the complaining parties could properly challenge the procedure which resulted in the listing of their names. The court thought it "unrealistic to contend that because the [Attorney General] gave no orders directly to the petitioners to change their course of conduct, relief cannot be granted against what [he] actually did. We long have granted relief to parties whose legal rights have been violated by unlawful public action, although such action made no direct demands upon them. [Citations.]"[10] (*Id.*, 341 U.S. at p. 141

A-C relationship and does not entail the largely independent problem of when A may challenge B's action on the ground that it infringes a right of C. (For a helpful treatment of this "third-party" problem, see Sedler, *Standing to Assert Constitutional Jus Tertii in the Supreme Court* (1962) 71 Yale L.J. 599.)

[10]At this point the court cited, *inter alia, Columbia Broadcasting System, Inc.* v. *United States, supra,* 316 U.S. 407; *Pierce* v. *Society of*

[95 L.Ed. at p. 837]; see also *Dombrowski* v. *Pfister* (1965) 380 U.S. 479 [14 L.Ed.2d 22, 85 S.Ct. 1116]; cf. *Copper Plumbing & Heating Co.* v. *Campbell* (D.C. Cir. 1961) 290 F.2d 368 [110 App. D.C. 177].)

Although *Joint Anti-Fascist* involved a formally disseminated list which had been officially compiled by an agent of the federal government, its holding applies with undiminished force to the situation which confronts us ·here—that of informal communications and threats emanating from a state agency. In *Bantam Books, Inc.* v. *Sullivan* (1963) 372 U.S. 58 [9 L.Ed.2d 584, 83 S.Ct. 631], for example, the Rhode Island Commission to Encourage Morality in Youth had notified a book distributor in that state that a majority of the commission's members considered certain books unsuitable for sale to minors. The commission urged the distributor not to deal in such literature and intimated that it would inform the state Attorney General in the event of non-compliance. Lacking authority to apply coercive sanctions of any kind, the commission issued no threats or orders to anyone. The New York publishers of the books in question, themselves the recipients of no command and the subjects of no proceeding, sought declaratory and injunctive relief against the commission's continued interference with their Rhode Island business, complaining that the commission had conducted no hearing to determine under proper standards which books to condemn.

Although the case resulted in four opinions, including one dissent, the nine justices were unanimous in concluding that the matter was ripe for adjudication and that, under controlling federal standards, the publishers had standing to sue (372 U.S. at pp. 64-65 fn. 6 [9 L.Ed.2d at pp. 589-590]) on the theory that ''if this were a private action. it would present a claim, plainly justiciable. of unlawful interference in advantageous business relations.'' (*Id.* at p. 65 fn. 6 [9 L.Ed. 2d at p. 590].) Relying upon the cases discussed herein, the court found irrelevant the fact that the commission's conduct was directed only to distributors and not to the complaining publishers themselves. (*Ibid.*)

We conclude that in the case now before us, just as in *Joint Anti-Fascist* and in *Bantam Books,* nothing can turn upon the fact that plaintiff challenges the procedural validity of an administrative action rather than the substantive legality of a

*Sisters, supra,* 268 U.S. 510; and *Truax* v. *Raich, supra,* 239 U.S. 33. (See fn. 9, *supra.*)

178

legislative enactment, nor can it make any difference that the challenged conduct induces others to forego future rather than past relationships.[11]

■ Building upon the basic holding of *Truax*, the decisions of the Supreme Court in *Joint Anti-Fascist* and in *Bantam Books* settle the proposition that whenever governmental action based upon a stigmatizing judgment injures an individual by inducing others not to deal with him, he may challenge in court the government's refusal to accord him a full hearing on the disputed facts which form the basis of its action. ■ Coupled with the holding of *Willner*, these decisions establish the principle that *any person whose freedom to pursue his profession is seriously restricted by an official action or course of conduct designed to discourage his employment may compel the government to afford him a hearing complying with the traditional requirements of due process.*[12] If this basic principle had been limited to cases in which the government moved directly against an individual and did so for a manifestly improper purpose, then state action ''aimed at . . . named individuals, which stigmatized their reputation and seriously impaired their chance to earn a living, could

---

[11]The Supreme Court has long recognized that such conduct, however informal and however prospective in effect, cannot escape the ultimate limitations which the Constitution imposes upon more traditional forms of government regulation. In *Keegan* v. *United States* (1945) 325 U.S. 478 [89 L.Ed. 1745, 65 S.Ct. 1203], for example, the court considered the effect of a statute which stated that the filling of certain private positions by members of the Communist Party or of the German-American Bund would contravene ''the expressed policy of the Congress.'' (*Id.* at pp. 483, 487 [89 L.Ed. at pp. 1748, 1751].) Since the ''policy'' in question was supported by no provision for enforcement, the government sought to defend it as a mere ''admonition,'' much as the Attorney General here attempts to dismiss the comimisisoner's conduct as mere ''advice.'' In his concurring opinion, Justice Black found that characterization wholly unpersuasive. (*Id.* at pp. 497-498 [89 L.Ed. at pp. 1755-1756].)

[12]The cases relied upon by the Attorney General to suggest the contrary have no bearing upon the issue here. Most of them simply reaffirm the undeniable proposition (see text accompanying fn. 5, *supra*) that the state may revoke a corporation's license because it employs unqualified persons. The remaining cases simply hold that, under the rules of the Securities and Exchange Commission, an employee may voluntarily become a party in disciplinary proceedings aganist his employer-registrant; the commission may not *compel* an employee's attendance (*Wallach* v. *Securities & Exchange Com.* (D.C. Cir. 1953) 202 F.2d 462 [92 App. D.C. 108]) but he is bound by the results of the hearing whether he chooses to appear (*Berko* v. *Securities & Exchange Com.* (2d Cir. 1963) 316 F.2d 137) or declines an invitation to do so (*Wallach* v. *Securities & Exchange Com.* (D.C. Cir. 1953) 206 F.2d 486 [93 App. D.C. 41]). Not surprisingly, no constitutional issue was raised or decided in the cited cases.

never be challenged in any court. Our Constitution did not contemplate such a result." (*United States* v. *Lovett* (1946) 328 U.S. 303, 314 [90 L.Ed. 1252, 1259, 66 S.Ct. 1093].)[13]

The Second Circuit has recently applied these principles to a situation which duplicates, in every significant respect, the matter before us here. That court held that a state officer could not constitutionally refuse to give a physician a trial-type hearing on charges which led to his dismissal from a hospital in New York City and which formed the basis of the officer's advice to other hospitals that they decline to hire the discharged doctor. (*Birnbaum* v. *Trussell* (2d Cir. 1966) 371 F.2d 672.) The doctor had been accused of discriminating against Negro hospital personnel. When he denied the charges, the hospital superintendent ordered him to appear at an informal hearing. The physician's efforts to obtain a copy of the charges against him proved futile, and he refused to submit himself to the proceeding which the superintendent had made available. The Deputy Commissioner of the New York City Department of Hospitals then directed the physician's dismissal and advised the city's other hospitals not to put him on their staffs.

The physician sued the Commissioner of the Department of Hospitals, his deputy commissioner, and the president of the local union which had initiated the accusations against him. He alleged a conspiracy to deprive him of rights secured by the federal Constitution, in violation of 42 U.S.C. section 1983 "and other sections of the Civil Rights Laws." After reviewing the decisions of the Supreme Court which we have discussed above, the Second Circuit held that the physician "could properly claim that by summarily discharging him in the midst of [the union's] accusations and by advising the other City hospitals . . . not to employ him, the Department of Hospitals gave [the charges against him] a stamp of official authority, and not only deprived him of his employment, but seriously damaged his professional reputation in the community as a physician." (371 F.2d at p. 677.) "In such circumstances," the court concluded, "the due process clause guarantees one the right to have notice of the charges against him and [entitles one] to a hearing on these charges before being dismissed." (*Ibid.*) Noting the "traditional distaste

---

[13]In *Lovett,* government employees were discharged from their official positions by an act of Congress. The court concluded that the act constituted a prohibited bill of attainder after finding the matter justiciable because Congress' action had damaged the petitioners' reputations and employability.

for an effective defamation without the ability to contest the charges in an impartial tribunal" (*id.* at p. 679 fn. 14), the court held that the casual "hearing" offered by the hospital could not be "deemed a substitute for the due process of law that the Constitution requires." (371 F.2d at p. 679 fn. 15.) "[A] full hearing," the court decided, "was the only way [the physician's] substantial interests [in reputation and employability] could have been protected. . . ." (*Id.* at p. 679.)

As the court in *Birnbaum* thus recognized, fundamental fairness requires that an individual be permitted to defend himself publicly against official charges, however informal, which threaten to stain his personal and professional future. (See *Slochower* v. *Board of etc. Education, supra,* 350 U.S. 551, 558 [100 L.Ed. 692, 700]; *Wieman* v. *Updegraff, supra,* 344 U.S. 183, 190-191 [97 L.Ed. 216, 221-222]; see also *Cafeteria & Restaurant Workers Union* v. *McElroy, supra,* 367 U.S. 886, 898-899 [6 L.Ed.2d 1230, 1238-1239]; 1 Davis, Administrative Law Treatise (1958) § 7.12, p. 459.) The *Birnbaum* court found no obstacle in the circumstance that the state had not attempted to revoke the physician's license; by affirming the physician's standing to challenge the *indirect* impact of the commissioner's action, the court recognized that "[s]tanding should not . . . be made an insuperable barrier [to] those whose rights have been abridged" and that "to impose distinctions of excessive refinement upon the doctrine . . . would . . . 'permit a quibbling distinction to overturn a principle which was designed to protect a fundamental right.' *United States* v. *Jeffers,* 342 U.S. 48, 52 [96 L.Ed. 59, 65, 72 S.Ct. 93]." (Harlan, J., dissenting on other grounds in *Berger* v. *New York* (1967) 388 U.S. 41, 103 [18 L.Ed.2d 1040, 1078, 87 S.Ct. 1893].)

## V

The Attorney General finally urges that, whatever result principle and precedent might require, this court should not inconvenience the commissioner by recognizing the plaintiff's right to a hearing. This suggestion is, to say the least, surprising. Since the "right to . . . a hearing is one of 'the rudiments of fair play' . . . assured . . . by the Fourteenth Amendment . . . . [t]here can be no compromise on the footing of convenience or expediency . . . when that minimal requirement has been neglected or ignored." (*Ohio Bell Tel. Co.* v. *Public Utilities Com.* (1937) 301 U.S. 292, 304-305 [81 L.Ed. 1093, 1101-1102, 57 S.Ct. 724].)

Moreover, even if we assume the commissioner's convenience could outweigh the commands of the Constitution, we cannot accept the Attorney General's argument. The plaintiff here does not insist that the commissioner must inevitably give the employee a hearing before filing any accusation against his employer, or even that the commissioner must invariably hear the employee's case before requiring his temporary suspension pending disciplinary proceedings against the employer. All plaintiff contends here is that, since one employer has already discharged him under pressure from the commissioner, he should now be afforded an opportunity to challenge the accusations lodged against him so that he can protect his reputation and obtain either reinstatement or a new position.[14] A procedure incorporating these measures would provide substantial protection to the employee without hindering the enforcement of the laws governing employers. (See *Sokol* v. *Public Utilities Com., supra,* 65 Cal.2d 247, 256.) Properly conceived, the plaintiff's request for a hearing imposes no undue burden upon the commissioner and presents no conflict between the needs of efficiency and the demands of due process.

If plaintiff's allegations prove to be accurate, he will be entitled to defend himself in a formal hearing;[15] unless the

[14]There may of course be certain circumstances, involving undisputed facts, in which no adversary hearing would be required. (See, e.g., *De Mille* v. *American Federation of Radio Artists* (1947) 31 Cal.2d 139, 154-155 [187 P.2d 769, 175 A.L.R. 382], holding that the enforcement of a by-law providing for automatic suspension of a union member upon failure to pay an assessment did not contravene the requirements of due process; compare (*Doyle* v. *Board of Barber Examiners, supra,* 219 Cal. App.2d 504, upholding the constitutionality of a provision authorizing the suspension of an employer's right to operate a barbershop whenever he hires more than two apprentices.) The present case, however, falls within no such exception, since the crucial charges underlying the commissioner's decision to discourage plaintiff's employment are, of course, hotly contested.

[15]According to plaintiff's complaint, the commissioner has already threatened two of plaintiff's employers (Huntington and State Loan), causing plaintiff to lose his job. Although plaintiff alleges further threats by the commisisoner, the crux of his complaint is the continuing cloud upon his personal and professional reputation resulting from the commissioner's charge that the plaintiff is guilty of fraud and embezzlement. Until plaintiff is permitted to clear his name in a public forum, the damage of which he complains will obviously persist whether or not the commisisoner has in fact made, or will continue to make, explicit threats to plaintiff's prospective employers. (See *Birnbaum* v. *Trussell, supra,* 371 F.2d at pp. 678-679 & fns. 13-14.) Plaintiff will have established his right to a hearing, therefore, once he has proved that the commissioner procured his dismissal by accusing him of a criminal act.

As to the nature of the required hearing, see *Shively* v. *Stewart, supra,* 65 Cal.2d 475, 479-480. (See also the Administrative Procedure Act, Gov. Code, §§ 11500-11529.)

commissioner promptly makes such a hearing available,[16] the plaintiff, having no adequate legal remedy, will be entitled to a declaration that the commissioner has acted arbitrarily and a permanent injunction to prevent the commissioner from further circulating his charges against the plaintiff or otherwise discouraging his employment.

Since the present case arises on demurrer, any attempt at this time to formulate a specific procedural arrangement for the vindication of plaintiff's rights would obviously be premature.[17] At this stage, all that is clear is that the trial court erred in dismissing plaintiff's complaint.

The judgment of dismissal entered by the trial court pursuant to its order sustaining the defendant's demurrer is reversed, and the cause is remanded for further proceedings consistent with this decision.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

McCOMB, J.—I dissent. I would affirm the judgment for the reasons expressed by Mr. Presiding Justice Wood in the opinion prepared by him for the Court of Appeal in *Endler* v. *Schutzbank* (Cal.App.) 57 Cal.Rptr. 824.

---

[16]The commissioner's statutory authority to fashion an appropriate procedure cannot be doubted. (See, e.g., Fin. Code, §§ 22206, 22211, 22400, 22601-22617.)

[17]The trial court will be in a better position to prescribe a combination of mandatory and preventive relief which will assure that the interests of all concerned receive adequate protection.