[Civ. No. 45110. Second Dist., Div. Three. Aug. 25, 1975.]

BANK OF AMERICA, as Executor, etc., Plaintiff and Appellant, v. CITY OF LONG BEACH et al., Defendants and Respondents.

**COUNSEL**

Demler, Perona, Langer, Bergkvist, Lauchengco & Lewine and Major Alan Langer for Plaintiff and Appellant.

Leonard Putnam, City Attorney, and Robert G. Austin, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

COLE (J. L.), J.*—From 1951 until his death on February 22, 1973, Kenneth Mumm operated an amusement game named "Clock-A-Line" in the City of Long Beach. He was continuously licensed by Long Beach during that period, a renewal license being issued each year. The last license expired on February 26, 1973. In April 1973, appellant Bank of America, as executor of the estate of Mr. Mumm, applied to the city for a renewal of the license. Pursuant to provisions of the Municipal Code the application was referred to the chief of police for a report. The city

*Assigned by the Chairman of the Judicial Council.

subsequently advised the bank that the license would not be issued because the police department refused to approve the application. The bank appealed to the city council. The latter purpoted to hold a hearing, and finding that the business sought to be licensed was a game of chance, which did not comply with applicable law and ordinances, denied the bank's application for a license.

A petition for writ of mandate and other relief was filed below. The court denied the petition, finding the facts to be as set forth above, and also finding that the city council listened to the evidence presented at the hearing, and that it showed that the game was one of chance. The court concluded that the bank's application was for an original (as opposed to a renewal) license, and that substantial evidence in the entire record of the proceedings supported the city council's determination. The petition was denied, and the bank prosecutes this action.

The record indicates that the game in question is identical to another game, Lite-O-Line, which has been licensed by Long Beach for many years, and whose license was renewed in the name of others after the death of the original proprietor. Long Beach officials, including the city prosecutor and chief of police determined, in 1944, that Lite-O-Line was a game of skill, and not a game of chance. In 1956, the superior court enjoined Long Beach and its officials from conducting any hearing to learn whether Lite-O-Line was a game of chance.

## I.

### Fairness of the Hearing

The bank's appeal to the city council was heard over several sessions. No witnesses were ever sworn, nor was there a request by anyone that this be done. The council had presented to it reports by the city manager, city prosecutor, city attorney and chief of police. The latter presented the police department's conclusion that Clock-A-Line was a game of chance. The city attorney recited the history of the Lite-O-Line game, and litigation concerning it. He concluded that the applicable court decisions relating to Lite-O-Line, including a prior decision of this court not published in the official reports, establish that once a license review is conducted and a license issued, city authorities are precluded from re-examining the license issuance.

It was stated by the city prosecutor and city manager that, under their interpretations of the decisions, Mr. Mumm would have been entitled to have his license renewed annually, for the balance of his life. However, the city attorney ruled that the bank's application, as executor was a new application, subject to review.

Five minutes before the hearing at which the bank's application was denied, a report of the city prosecutor, to which was appended an investigation of the Lite-O-Line game conducted by two college professors at his request in 1956, was handed to counsel for the bank.

At various of the council hearings police and other city officials were allowed to state their conclusions that Clock-A-Line was a game of chance. Counsel for the bank indicated that he had about seven witnesses to present on that issue. The council refused to allow them to be heard, apparently on the theory that the evidence would be of a repetitive nature, although no bank witnesses had testified to the issue at that point. Several councilmen indicated that additional testimony should be allowed, but the Mayor concluded that only one would be allowed to testify.

 Thus, the bank was denied the opportunity to present evidence on the only issue which the council had before it—whether the game was one of skill or chance. A full opportunity to present a defense is an essential ingredient of due process, especially when the heavy hand of government is about to deny to an individual the right to pursue an occupation. (*Endler* v. *Schutzbank* (1968) 68 Cal.2d 162, 172 [65 Cal.Rptr. 297, 436 P.2d 297].) What constitutes such an opportunity will vary according to the nature of the hearing involved. "The contours of due process in this connection are not always the same." (*Endler* v. *Schutzbank, supra,* at p. 170.)

We conclude that the action of the council in refusing to hear the witnesses was erroneous. Any meaningful opportunity for the bank to present its position was denied to it. We do not suggest that the council was purposefully arbitrary. The record of the hearings before it, which we have read in full, shows that various members were concerned about the fairness of a ruling which would deny to the bank the operation of the Clock-A-Line game, while letting the identical Lite-O-Line continue, apparently for an indefinite period. Nevertheless, a police officer and the city prosecutor were allowed to state their conclusions that the game was one of chance; memoranda prepared by city officers elaborated on this

point. The council asked questions of these witnesses. The one witness allowed to testify for the bank, the designer of the machine used in the Clock-A-Line game, stated why he thought the game was one of skill. The additional witnesses were not given any opportunity to address themselves to the issue. When counsel for the bank stated that the witnesses would support his position, the Mayor said: ". . . I can see no objective in sitting here and listening to seven people getting up, probably repeating one after the other, so let's listen to one . . . ."

Of course, repetitive and cumulative testimony does not have to be tolerated. But the bank was not given a chance to have the witnesses say anything at all. Since the question to which they intended to address themselves was the very issue upon which the granting or denial of the application depended, the bank was denied an important right. The city argues that counsel for the bank did not state what the witnesses would testify to. Our reading of the proceeding indicates that no real opportunity was ever afforded it to do so. The Mayor's consent that one witness testify was obviously given grudgingly. Another of the council members had stated that the issue was for the courts, not the council, and a third moved to deny the permit, even before the bank tried to have the witnesses testify, and when informed of that desire said "Well, I think that we've had sufficient testimony, and I'd like to move this inside the rail and make the motion that we deny the permit."

The majority of the council obviously had its mind made up and did not want to let the bank try to persuade it to the contrary.[1]

---

[1]Shortly after the single witness for the bank made his brief statement the hearing concluded with the following colloquy among Mr. Mansell, the city manager, and various council members.

"Mr. Mansell: The Chief of the Police Department's position and their action is that they are attempting to eliminate gambling as much as possible in the community. Anytime that they have an opportunity, in their judgment, that a gambling game can be eliminted they shall do so and that's what they did in Clock-O-Line when they made their recommendation that in their opinion it was gambling. The day the City Attorney or the City Prosecutor or the courts indicate to the Chief of Police that we have a right to close Lite-A-Line it will be closed up within two hours after we get the order. We've gone there and I've gone to the City Prosecutor myself no less than six times since I've been City Manager of this City to ask him his opinion because this comes up, comes up and comes up. And that is why I am happy that Dr. Clark has asked for the complete record from beginning to end which indicates the court actions on this.

"Councilman Clark: Mr. Mayor, I might just mention that I feel that if there's anyway that we could also eliminate the other games on the Pike, Lite-A-Line, then I would certainly be very happy to do that. I think that, Mr. Sharp, that we're more likely to get rid of Lite-A-Line by getting rid of a game similar to it than if we give a license to this game. Now do you feel that if we give a license to this game that we're going to get rid of Lite-A-Line eventually?

"Councilman Sharp: No, Tom, I just—get away from the legal aspects—just good

The bank also objects to the fact that the report from the city prosecutor, and other documents, were not given to it until five minutes before the last hearing. Clearly, evidence to be used against a party must be disclosed in such fashion that there is an opportunity to rebut it. (*Endler* v. *Schutzbank, supra,* 68 Cal.2d at p. 172; *People* ex rel. *Dept. Pub. Wks.* v. *McNamara Corp., Ltd.* (1972) 28 Cal.App.3d 641, 651 [104 Cal.Rptr. 822].) The city urges that the bank has failed to show in what manner it has been prejudiced by not receiving the copies of the documents. Yet, this very evidence is cited by Long Beach as substantial evidence, sufficient to support the judgment.

And, contrary to the city's contention, counsel for the bank did make a point of inserting in the record his comment that the reports had just been served upon him, and that there had been no opportunity to review them. That, under the circumstances, was a sufficient objection, since it

---

common sense. I will say that one person now has the City locked up. At least give the guy some competition.

"Councilman Clark: I would like to see what we could do to eliminate that one individual that has the City locked up, as you say. I think this is a step where we'll have a chance to do that. If we give a license to this game which is a similar or identical game, then we're certainly not going to get rid of Lite-A-Line eventually. I'd be the first one to get rid of Lite-A-Line if we have a chance to do it and I'd like to look into Lite-A-Line to see what the aspects of the ownership are.

"Councilman Sharp: Well, you can't, Tom. They say you can't. . . .

"Councilman Clark: I don't know that we can't look into it because we do have a new owner. I don't know what the legalities of the ownership are because Mr. Looff no longer has that, as you know. There may be some aspects here as to ownership, legal ownership, that I would be curious about. But I think if we. . . . I don't think we've got any other way to go on this if you want to eliminate these games on the Pike.

"Mayor Wade: We have the motion to deny the appeal.

"Councilman Phillips: Lt. Welch, while you're right there. You have publicly stated and I would like for the record, for you to state that you feel this is a gambling game, is that correct?

"Lt. Welch: Yes.

"Councilman Phillips: And that is the position of the Chief of Police and the Police Department as well as the City Prosecutor?

"Lt. Welch: Yes, it is.

"Councilman Phillips: And it has been stated, I believe, by the City Attorney that this does require a new application?

"Lt. Welch: This is true.

"Councilman Phillips: Thank you.

"Mayor Wade: We have the motion to receive the communications, conclude the hearing and deny the appeal. Any further discussion? Call the roll.

"The motion carried by the following vote:

| "AYES: | COUNCILMEN: | Phillips, Simon, Clark. Wilson, Cruchley. |
|---|---|---|
| NOES: | " : | Sharp, Rubley. |
| ABSENT: | " : | Bond. |
| NOT VOTING: | " : | Wade." |

called to the attention of the city and its attorneys, who were present, the circumstances now complained about.[2]

## II.

### Binding or Res Judicata
### Effect of Prior City Licensing

Since we order the case returned to the Long Beach City Council for further proceedings, we must inquire whether the city is precluded from holding a fair hearing as to whether Clock-A-Line is, or is not, a game of skill. We conclude that the question is open for decision.

The bank urges that the doctrine of res judicata prevents the city from now determining that Clock-A-Line is a game of chance rather than skill. As a second proposition the bank argues that, as Mr. Mumm's executor, its application for a license was simply a renewal application similar to those made over the years by Mr. Mumm.

It will be remembered that Mr. Mumm's license was renewed annually for a period of approximately 22 years. During that time, and now, the applicable Long Beach ordinance (Mun. Code, § 6100.189) provided that every person required to pay any license fee should apply to the city tax collector, who shall thereafter refer the application to the appropriate city government department in order to ascertain whether of not the business proposed to be conducted, or the premises in which it is proposed to be located will comply with applicable laws and ordinances.

Section 6100.190 of the Long Beach Municipal Code reads: "Upon receipt of written notice from such department that such business and the location at which it is proposed to conduct the same will so comply, it shall be the duty of the Tax Collector to prepare and issue a license to the person making application therefor upon the payment of the proper fees."

---

[2]The bank argues that there was no legally competent evidence in the record, on which to base the council's refusal of a license. We need not consider the hearsay objection suggested by the bank. It is enough to say that we have found no place where any of the various reports furnished to the council (as opposed to unsworn testimony of witnesses) were actually received in evidence. This is essential to the existence of the hearing required by due process. (*English v. City of Long Beach* (1950) 35 Cal.2d 155, 158 [217 P.2d 22, 18 A.L.R.2d 547]; *Boreta Enterprises, Inc. v. Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 104 [84 Cal.Rptr. 113, 465 P.2d 1].)

The code also provides that if a license tax is not paid within 30 days after the due date a penalty of 10 percent must also be paid. The code contains no other prerequisites or requirements for an amusement license.

It was Long Beach's position, expressed by the city prosecutor, and the city manager that Long Beach would have continued to renew Mr. Mumm's license had he lived. This view is premised on the 1956 superior court decision which enjoined the city and its officials from holding any hearing to determine if Lite-O-Line was a gambling game, and on the unreported appellate decision referred to above. The city also took the position that the bank's application constituted a new application and that it was immaterial that Lite-O-Line, an identical game, long had been and continued to be licensed to other persons.

The city prosecutor took the position, both in statements to the council and in a report presented to it, that since city officials (his predecessor and police officers) "must have determined that the [Clock-A-Line] game was a game of skill before they could have issued the license in the first place," that there was a presumption that official duty was performed, and that because of that presumption Clock-A-Line was permitted to continue to operate although a new applicant would not be granted a license. He further stated that he believed the city would be estopped from refusing to renew the license.[3]

■ The issue then is whether the city in 1973 was precluded from determining that Clock-A-Line was a game of chance, and therefore not entitled to a license, because in prior years city officials, in presumed compliance with their duty under Long Beach Municipal Code section 6100.189, determined that it was a game of skill entitled to be licensed. The question does not lend itself to easy answers.

■ Principles of res judicata or collateral estoppel should not be applied indiscriminately to decisions of administrative agencies. " 'The key to a sound solution of problems of res judicata in administrative law

---

[3]In a memorandum decision in the superior court case mentioned above involving Lite-O-Line, the court stated that because the city prosecutor and the chief of police in 1943 conducted an investigation and determined that the Lite-O-Line game was one of skill and not chance the question was res judicata and could not be inquired into by the city in 1956. On that basis it issued an injunction restraining them from conducting the proposed hearing on the question of whether Lite-O-Line involved gambling. That is not a judicial adjudication that Lite-O-Line, concededly identical to Clock-A-Line, is a game of skill. Therefore the doctrine of the collateral estoppel effect of a judicial adjudication as enunciated in *Bernhard* v. *Bank of America* (1942) 19 Cal.2d 807 [122 P.2d 892], plays no role here.

is recognition that the traditional principle of res judicata as developed in the judicial system should be fully applicable to some administrative action, that the principle should not be applicable to other administrative action, and that much administrative action should be subject to a qualified or relaxed set of rules concerning res judicata.' (2 Davis, Administrative Law, 568; . . ." (*Hollywood Circle, Inc.* v. *Dept. of Alcoholic Beverage Control* (1961) 55 Cal.2d 728, 732 [13 Cal.Rptr. 104, 361 P.2d 712].)

Considerations underlying the application of res judicata and collateral estoppel must be carefully balanced against competing problems. The doctrine that prior adjudications are binding has underlying it a policy of limiting litigation by preventing a party who has had one fair trial from again drawing the issue into controversy. It serves to protect persons from vexation and expense arising from repeated litigation, conserves the resources of the tribunal involved, and avoids the possibility of conflicting results. (*Bernhard* v. *Bank of America, supra,* 19 Cal.2d 807, 811 [122 P.2d 892]; 65 Harv.L.Rev. 818, 820.) "However, the conclusiveness of prior judgments may force overzealous litigation, perpetuate erroneous decisions and hamper the flexibility of the courts. Both judicial formulation and scholarly examination of the rules of res judicata should balance these opposing considerations." (65 Harv.L.Rev. at p. 820.)

Seeming conflicts in the decisions are reconcilable when the competition among policies is taken into account. Thus, the bank places its reliance on *Olive Proration etc. Com.* v. *Agricultural etc. Com.* (1941) 17 Cal.2d 204, 208-209 [109 P.2d 918]. There the court noted that res judicata "may not appropriately be applied" when administrative bodies are given rule-making authority but stated that when orders relate to what "may be rather broadly defined as individual rights" the binding effect of an administrative decision depends upon the kind of power exercised in making the order and the terms of the statute under which it was exercised. With reference to the kind of power exercised in making the order the court said that: "[A]lmost without exception, courts have held that the determination of an administrative agency as to the existence of a fact or status which is based upon a present or past group of facts, may not thereafter be altered or modified." (17 Cal.2d at p. 209.) Cited in support was *Muncy* v. *Hughes* (1936) 265 Ky. 588 [97 S.W.2d 546] (city council order declaring individual duly elected was final, precluding a later change of mind by the council); *Little* v. *Board of Adjustment* (1928) 195 N.C. 793 [143 S.E. 827] (prior decision of board, on appeal from building inspector's decision to deny permit, was res

judicata and could not be re-opened on identical facts) and *Lilienthal* v. *City of Wyandotte* (1938) 286 Mich. 604 [282 N.W. 837] (once dismissed civil charges could not be resurrected). In *Olive Proration, supra,* our Supreme Court held that since the commission involved did not have continuing jurisdiction to modify its orders, it could not reverse an earlier determination reached after a consideration of all of the facts.

Long Beach, on the other hand, relies upon *Weiss* v. *State Board of Equalization* (1953) 40 Cal.2d 772 [256 P.2d 1]. There the court upheld the board's decision refusing to issue an off-sale beer and wine license to plaintiffs because of the proximity of the premises to a school. Plaintiffs urged that the board had previously licensed other persons in the same immediate vicinity and claimed that the refusal to issue a license in this case was arbitrary. The Supreme Court refused to order a permit to be issued.

In so holding, the court stated that "plaintiffs' argument comes down to the contention that because the board may have erroneously granted licenses to be used near the school in the past it must continue its error and grant plaintiffs' application." (40 Cal.2d at p. 776.) The court's discussion of this contention consisted of a long quotation from Davis, Administrative Law, section 168, including these statements: " '[D]ue process. . . probably also permits [in the case of administrative agencies] substantial deviation from the principle of stare decisis. Like courts, agencies may overrule prior decisions or practices and may initiate new policy or law through adjudication. . . . Probably deliberate change in or deviation from established administrative policy should be permitted so long as the action is not arbitrary or unreasonable. This is the view of most courts.' " (40 Cal.2d at pp. 776-777.) The court concluded that the Board of Equalization was not acting arbitrarily if it changed its position, because it may have concluded that another license would be too many in the vicinity of the school. (See, also *California Employment Com.* v. *Black-Foxe Military Inst.* (1941) 43 Cal.App.2d Supp., 868, 876 [110 P.2d 729].)

In *Aylward* v. *State Board etc. Examiners* (1948) 31 Cal.2d 833 [192 P.2d 929], in response to charges that the licenses of petitioners had been issued contrary to the provisions of the statutes, the board first determined that the charges were not valid and that the licenses were regular. The next year, however, the board cancelled the licenses in question. The court stated: "The doctrine of res judicata in the strict sense is not applicable to a statewide agency such as respondent, which is without power to make a final determination of a question of fact, and its

decision will not be given res judicata effect in a subsequent action *in court*. (See *Empire Star Mines Co.* v. *California Emp. Com.*, 28 Cal.2d 33, 47-48 [168 P.2d 686].) The *agency* however, may be bound by its prior action where it has made a determination of a question of fact within its powers, and it lacks authority to rehear or reopen the question. [Citations omitted] . . . Where a board's order is not based upon a determination of fact, but upon an erroneous conclusion of law, and is without the board's authority, the order is clearly void and hence subject to collateral attack, and there is no good reason for holding the order binding on the board. . . ."

The question, therefore, is whether it has been erroneously determined as a matter of law that no cause for revocation has been established. . . ." (31 Cal.2d at pp. 838-839.) Discussing the substantive issues the court then found that the licenses were properly issued. It sustained a judgment of the trial court annulling the second order cancelling the licenses, but held that the board still should not be precluded from taking action against the petitioners on any proper legal ground and modified the judgment which prohibited it from doing so.[4] This decision was characterized by the court, in *Hollywood Circle, Inc.* v. *Dept. of Alcoholic Beverage Control, supra,* 55 Cal.2d 728, 732, as meaning that "the public interest in preventing the practice of a profession by one not qualified may require a further review of the law applicable to a license to practice. . . ."

In *Carrick* v. *City & County of San Francisco* (1962) 202 Cal.App.2d 402 [20 Cal.Rptr. 878], two retired employees and the widow of a third sought a declaration that the three employees had been improperly classified when they retired so as to deny them classification as prior department members, the retirement board having years earlier classified them as miscellaneous employees. In support of the suit it was established that subsequently two employees similarly situated had retired and been classified as firemen by the board. The court first held that the latter classification was erroneous. In response to appellants' contention that the court was nevertheless bound by the board's determination in regard to the two last retired individuals the court pointed out that the contention was in effect "that an administrative body which makes an erroneous decision as to a given set of facts must

---

[4]We do not believe the correct result in the present case can be arrived at, as Long Beach urges, simply by distinguishing between cases involving licenses granted as opposed to those involving revocation. "Under appropriate circumstances, such as we have here, the same rules apply to the determination of an application for a license as those for the revocation of a license." (*Weiss* v. *State Board of Equalization, supra,* at p. 775.)

perpetuate that error whenever it is again presented with an identical fact situation." (202 Cal.App.2d at p. 407.) Citing *Weiss* v. *State Board of Equalization, supra,* 40 Cal.2d 772, the court then stated that neither the board nor the trial court were bound by the board's prior decision since it involved the construction of a statute reasonably susceptible of more than one interpretation.

■ The theme that we draw from *Weiss, Aylward, Hollywood Circle,* and *Carrick* is that a factual determination, once made perhaps erroneously, should not bind the agency forever.

We believe that it is clear that Long Beach should not be precluded from looking anew at its licensing programs.[5] This is particularly true for several reasons.

First: the council itself has never truly decided the question at issue. The actions which are claimed to have established Clock-A-Line as a game of skill are those of the city officials who reviewed the previous license applications and reported to the tax collector pursuant to Long Beach Municipal Code sections 6100.189 and 6100.190 that the licenses could be issued. With the appropriate city officials being in previous agreement on that proposition, there was no occasion for the question to be tested before the Long Beach City Council. We believe the trial court here was right in commenting that the action of the officials was not one that is clothed with the finality and permanence of a decision of a quasi judicial tribunal such as a city council. The city council itself, the highest ranking agency involved, has never before had an opportunity to determine the question.

Second: to hold that an improper determination of the city officials is binding, would commit Long Beach indefinitely to licensing the game. If the administrative decision was wrong such a holding would involve persistence in error. The law does not require this. (*Weiss* v. *State Board of Equalization, supra,* 40 Cal.2d 772, and *Carrick* v. *City & County of San Francisco, supra,* 202 Cal.App.2d 402.)

Third: we are not here concerned in any way with the injunction previously issued by the superior court in the case involving Lite-O-Line. We express no opinion as to the continuing effect of that injunction on

[5] In light of this conclusion we do not pause to attempt to reconcile seemingly conflicting statements in other cases, as to the applicability, *vel non,* of res judicata to administrative decisions.

■

the Lite-O-Line game.[6] The fact that Lite-O-Line is licensed does not preclude Long Beach from determining whether or not Clock-A-Line is a game of chance. (*Carrick* v. *City & County of San Francisco, supra,* 202 Cal.App.2d 402.) The Long Beach City Council is free to determine, after a full and fair hearing in which each side may introduce evidence, whether the Clock-A-Line game is one of skill or chance.

Our conclusion makes it unnecessary to discuss the bank's contention that its application was not an original one but rather merely a renewal of Mr. Mumm's previous license. Nor is it necessary to determine other questions raised by the parties.

The judgment is reversed with directions to the trial court to enter judgment commanding the City of Long Beach and its officials to proceed in a manner consistent with this decision.

Cobey, Acting P. J., and Potter, J., concurred.

---

[6]We do not consider whether there is any constitutional question arising from what could be disparate treatment of essentially identical games. That issue has not been raised herein.