[Civ. No. 30109. First Dist., Div. One. Jan. 26, 1973.]

WILLIAM HOWARD PURIFOY, Plaintiff and Appellant, v.
STATE BOARD OF EDUCATION, Defendant and Respondent.

**COUNSEL**

Paul N. Halvonik and Charles C. Marson for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Richard L. Mayers, Deputy Attorney General, for Defendant and Respondent.

## OPINION

**MOLINARI, P. J.**—This is an appeal by William Purifoy from an order and judgment denying his petition for a writ of mandate ordering the State Board of Education to afford him a fair hearing on his fitness to teach and, pending the outcome of such hearing, to rescind all action taken against his teaching credential and expunge all records of any such action.

Purifoy had been the certified holder of a life credential, required for teaching in the public secondary schools of this state. He had been employed as a secondary school teacher at Madison Junior High School in Oakland. On March 12, 1969, Purifoy was arrested and charged with a violation of Penal Code section 647, subdivision (d). Subsequently he was charged with a violation of Penal Code section 647, subdivision (a)[1] in connection with the same incident. Purifoy was relieved of his duties at Madison Junior High School on March 17, 1969. On October 3, 1969, after a jury trial, Purifoy was convicted on both charges. The State Board of Education suspended Purifoy's teaching credential on January 9, 1970. The suspension was announced to Purifoy in a letter dated January 13, 1970.

The letter states that Purifoy's credential was suspended pursuant to section 13207 of the Education Code.[2] Said section provides that "Whenever the holder of any credential, life diploma, or document issued by the State Board of Education has been convicted of any sex offense as defined in section 12912[3] . . . the State Board of Education shall forthwith suspend the credential, life diploma, or document. If the conviction is reversed and the holder is acquitted of the offense in a new trial or the charges against him are dismissed, the board shall forthwith terminate the suspension of the credential, life diploma, or document. When the conviction becomes final or when imposition of sentence is suspended the board shall forthwith revoke the credential, life diploma, or document."

Purifoy contends that section 13207 is unconstitutional because it deprives him of due process in that it bars him from his profession without any evidence that he is unfit to teach, and without notice of the charges against him or a fair hearing on his exclusion, and is a conclusive presump-

---

[1]Penal Code section 647 provides, in relevant part, that "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: (a) Who solicits anyone to engage in or who engages in lewd or dissolute conduct in any public place or in any place open to the public or exposed to public view. . . . (d) Who loiters in or about any toilet open to the public for the purpose of engaging in or soliciting any lewd or lascivious or any unlawful act."

[2]Unless otherwise indicated, all statutory references are to the Education Code.

[3]Section 12912 provides, inter alia, that any offense defined in subdivision (a) or (d) of section 647 of the Penal Code is a "sex offense."

tion that every person convicted of the stated offenses is unfit to teach, which presumption is empirically false. Purifoy contends that the section is also unconstitutional because it deprives him of the equal protection of the laws in that there is no compelling state interest which necessitates denying certain credential holders the right to notice and a hearing on the issue of whether they are unfit to teach, whereas other holders of a credential not coming within the purview of section 13207 are entitled to an administrative hearing.

The Fourteenth Amendment protects the right of an individual to pursue his chosen profession without interference by arbitrary state action. (*Endler* v. *Schutzbank*, 68 Cal.2d 162, 169 [65 Cal.Rptr. 297, 436 P.2d 297].) ██ A state may not exclude an individual from any profession in a manner or for reasons which are in contravention of the due process or equal protection clause of the Fourteenth Amendment. (*Endler* v. *Schutzbank, supra,* at p. 170; *Schware* v. *Board of Bar Examiners,* 353 U.S. 232, 238-239 [1 L.Ed.2d 796, 801-802, 77 S.Ct. 752, 64 A.L.R.2d 288].) The requirements of due process, however, are not inflexible, but rather are dependent upon the nature of the governmental function involved and the private interest affected. (*Endler* v. *Schutzbank, supra.*)

In approaching the issue of due process in the instant case we first harken back to the case of *In re Collins* (1922) 188 Cal. 701 [206 P. 990, 32 A.L.R. 1062]. That case involved a constitutional attack upon various sections of the Code of Civil Procedure which authorized the Supreme Court to issue an ex parte order disbarring an attorney if it received a certified copy of a record showing the attorney had been convicted of a crime involving moral turpitude. Relying upon *Ex Parte Wall,* 107 U.S. 265, 273 [27 L.Ed. 552, 556, 2 S.Ct. 569], the court first found that the Legislature was entitled to provide for automatic disbarment upon commission of a crime involving moral turpitude. (188 Cal. at pp. 705-706.) The court then turned to *In re Riccardi* (1920) 182 Cal. 675, 680 [189 P. 694], for the proposition that it had no discretion under the existing statutes to give any judgment other than disbarment. (188 Cal. at p. 707.) In response to the contention that the attorney was entitled to notice and a hearing prior to being disbarred, the court stated "the essential fact working a deprivation of the petitioner's right and privilege of continuing in the practice of his profession was not his conviction of a crime, nor was it the order of this court made automatically upon the receipt of the record of such conviction, but it was his violation of the law in the commission of said crime; and as to that he had his day in court when he was put to trial for and convicted of the commission of such crime." (188 Cal. at p. 706.) "The only notice which the accused attorney is to have . . . is that which he receives on the trial of

the criminal charge of which he has been convicted. The law informs him that one of the results of his conviction will be his subsequent disbarment . . . . This answers the constitutional requirement that he shall have due process of law before he can be deprived of his right to practice. The entire matter is involved in the criminal proceeding." (188 Cal. at p. 708.)

The assumption that everything is necessarily involved in the criminal proceeding brought against an attorney was rejected in the case of *In re Hallinan* (1954) 43 Cal.2d 243 [272 P.2d 768], involving a proceeding for the attorney's disbarment. The court reasoned as follows: "The provision that the record of conviction is conclusive evidence was inserted in the statute in order that this court could disbar an attorney, convicted of a crime involving moral turpitude, without giving him further notice or hearing. (*In re Collins,* 188 Cal. 701, 703, 706-708 . . . .) Only when an attorney is indicted for a crime the commission of which would in every case evidence a bad moral character, is the issue of moral turpitude tendered in the criminal trial. If an attorney could be summarily disbarred after conviction for a crime, the minimum elements of which do not involve moral turpitude, he would never have an opportunity to be heard on the issue on which his disbarment depends. We must assume that every jury in a criminal trial is properly instructed to convict the defendant if they find the minimum elements of the offense charged, and it would be mere speculation to conclude in any case that a jury finds a defendant guilty of conduct alleged in the indictment, proof of which is unnecessary to his conviction, merely because the jury brought in a verdict of guilty." (43 Cal.2d at p. 249.)

Following the *Hallinan* case the Supreme Court was called upon, in *DiGenova* v. *State Board of Education* (1955) 45 Cal.2d 255 [288 P.2d 862], to construe section 12756 which, with certain changes not here relevant, is now section 13207, with which we are here concerned. The court rejected the contention that the statute should be construed as to require a hearing, noting that the statute employed the terms "shall" and "forthwith" and stating that the use of these terms implied that "the credential should be revoked without the delay which would be incident to a hearing, probably for the reason that teachers convicted of sex offenses should be promptly removed from the classroom and contact with students." (At p. 259.) The court further noted that other related statutory provisions pertaining to credentials made express provision for notice and hearing and stated that this was "indicative of a legislative intent that no hearing is to be had under section 12756." (At pp. 259-260.)

The Supreme Court, in *DiGenova,* relying on *Collins* and *Riccardi,* went on to observe that in the revocation of a license for the conviction of a specified crime under statutes like 12756 (now 13207) there is no real necessity

for the board to examine the facts, resolve any conflicts in the evidence, and exercise its judgment in respect thereto since there can be little dispute regarding the conviction as it is a matter of public record. (45 Cal.2d at p. 260.) The court viewed the board's action as ministerial rather than quasi-judicial. (At p. 260.) Accordingly, the court concluded that the plaintiff's constitutional rights were not violated, and that since there was a mandatory duty to revoke the credentials upon the conviction of the crime, no hearing by the board was required. (At p. 262.) It should be noted here that *DiGenova* takes cognizance of *In re Hallinan* and cites that case as authority for the proposition that the record of conviction is conclusive evidence of the particular crime of which the defendant was convicted. (At p. 262.)

Subsequent decisions have not invalidated the premises upon which the conclusion in *Riccardi, Collins* and *DiGenova* is based. The principle articulated in these cases was recently reiterated by this court in *Slaughter* v. *Edwards,* 11 Cal.App.3d 285 [90 Cal.Rptr. 144], where we pointed out the distinction between the rule making it mandatory to revoke a license where the licensee has been convicted of a specified crime and the case where an independent judicial or quasi-judicial determination of facts as the basis for the suspension or revocation of the license must be made. (At pp. 293-294.) In the former situation the ascertainment of the specified event making it mandatory to suspend or revoke is a question of law and due process is satisfied because the licensee had his day in court when he was put on trial for and convicted of the specified crime; in the latter situation the ascertainment of the event requiring a suspension or revocation requires an examination of the facts and a license may not be suspended or revoked without granting a hearing to the licensee. (11 Cal.App.3d at pp. 293-294.)

We apprehend that the distinction pointed out by us in *Slaughter* serves to distinguish *Hallinan* from *DiGenova*. In *Hallinan* the language of the statute clearly indicated that an attorney could be summarily disbarred *only* when the crime of which he was convicted involved moral turpitude, and since moral turpitude must be inherent in the commission of the crime itself to warrant summary disbarment under the applicable statutes, a further hearing, upon notice, was required in order to determine whether the crime for which he was convicted was one involving moral turpitude. (43 Cal.2d at pp. 248-249.) As pointed out in *Hallinan,* it is only where the commission of the crime would in *every case* evidence a bad moral character that the issue of moral turpitude is tendered in the criminal trial. (At p. 249.) Where, however, the *nature of the particular crime* does not reflect a bad moral character and is such that its minimum elements do not involve moral turpitude, the conviction per se is not a determination that the crime was one involving moral turpitude.

In *DiGenova,* on the other hand, the court was not concerned with whether the nature of the particular crime involved moral turpitude but solely with the question whether the plaintiff committed the specified sex offense, since the language of the statute there involved provided that when a person has been convicted of any one of certain specified crimes the board "shall forthwith" revoke the credential when the conviction becomes final. This is the situation in the instant case which essentially is on "all fours" with *DiGenova.*[4]

We are not compelled to a different conclusion by *Lorenz* v. *Board of Medical Examiners,* 46 Cal.2d 684 [298 P.2d 537], or by *Endler* v. *Schutzbank, supra,* 68 Cal.2d 162, by *Morrison* v. *State Board of Education,* 1 Cal.3d 214 [82 Cal.Rptr. 175, 461 P.2d 375], or by *Stanley* v. *Illinois,* 405 U.S. 645 [31 L.Ed.2d 551, 92 S.Ct. 1208].

*Lorenz* is a case involving statutory provisions permitting the suspension or revocation of a physician's license upon a conviction of a crime involving moral turpitude. It was there concluded, upon the rationale of *Hallinan,* that the offense of giving an alcoholic beverage to a person under the age of 21 years does not in every case evidence a bad moral character; that, therefore, moral turpitude was not inherent in the crime itself; and that conviction alone did not warrant suspension or cancellation of the license. (46 Cal.2d at p. 687.)

In *Endler* the Commissioner of Corporations threatened disciplinary action against anyone who might employ the plaintiff upon the basis of *unproved* criminal accusations. The conduct of the commissioner, rendering the plaintiff unemployable without affording him a full hearing on the charges against him, deprived the plaintiff of due process of law. (68 Cal.2d at p. 165.) The rationale of *Endler* is that the plaintiff was made an outcast in his own profession without affording him a full opportunity to present his defense. (At p. 173.) In the instant case, full opportunity to present his defense was afforded plaintiff in the criminal proceeding.

In *Morrison* the Supreme Court was called upon to determine the meaning which was to be ascribed to the terms "immoral" and "unprofessional

---

[4]We note that there are statutes in the Education Code making the suspension or revocation of a credential dependent upon an act involving moral turpitude. Section 13202 provides that "The State Board of Education shall revoke or suspend for immoral or unprofessional conduct, or for persistent defiance of, and refusal to obey, the laws regulating the duties of persons serving in the Public School System, or for any cause which would have warranted the denial of an application for a certification document or the renewal thereof, or for evident unfitness for service, life diplomas, documents, or credentials issued pursuant to this code." Among the causes for denial of such documents is the commission of "any act involving moral turpitude." (§ 13129, subd. (e).)

conduct" and "acts involving moral turpitude" as used in the Education Code. The court observed that such terms "constitute only lingual abstractions until applied to a specific occupation and given content by reference to fitness for the performance of that vocation." (1 Cal.3d at p. 239.) The court thus declined to interpret the terms in the light of some generalized conception of morality, and concluded that the Board of Education could not abstractly characterize conduct as "immoral," "unprofessional" or "involving moral turpitude" within the meaning of section 13202 unless the conduct indicates that the petitioner is unfit to teach, a determination to be made by the board according to applicable factors and standards. (At pp. 229-230.) We observe that *Morrison* involved the application of section 13202, which is dependent on a finding of unfitness to teach based on a finding of immorality, or unprofessional conduct, or acts involving moral turpitude, while the instant case is based on section 13207 which is solely dependent upon a conviction of a specified crime. In *Morrison* the petitioner was not convicted of any crime. (1 Cal.3d at p. 219.)

It is significant to note that *Morrison* recognizes that the Education Code draws an important distinction between different types of sexual indiscretion by teachers, i.e., the conviction of certain crimes entailing automatic dismissal and sexual misconduct resulting in discipline only if it is "immoral," "unprofessional" or involves "moral turpitude," and that in the former situation a teacher is not entitled to a hearing, while in the latter he is. (1 Cal.3d at p. 218, fn. 4.) As authority for the proposition that the conviction of certain sex crimes entails automatic dismissal, *Morrison* cites the *DiGenova* case. (1 Cal.3d at pp. 218-219, fn. 4.) In sum, *Morrison*, citing *Hallinan* and *Lorenz,* utilizes the rationale of those cases in asserting that, in determining whether discipline is authorized on the basis that sexual misconduct is "immoral," "unprofessional" or involves "moral turpitude," "a criminal conviction has no talismanic significance." (1 Cal.3d at pp. 218-219, fn. 4.)

We are not unmindful that in referring to the conviction of sex crimes entailing automatic dismissal *Morrison* makes reference to section 13206, but not to section 13207. We think the omission was merely inadvertent. Sections 13206 and 13207 are similar in context. Section 13206 refers to various felonies among which are included such sex offenses as rape and the crime of perversion defined in Penal Code section 288a. Section 13207, on the other hand, deals with specific sex offenses as particularly defined in section 12912, among which are included the offense defined in Penal Code section 288a and certain specific types of rape, i.e., those defined in subdivisions 3 and 4 of Penal Code section 261 as well as other sex offenses among which are those involved in the instant case. We observe, moreover, that in the same footnote and preceding the subject reference to

section 13206, the court makes the following relevant observation: "Neither . . . public solicitation of lewd acts (Pen. Code, § 647, subd. (a)), loitering near public toilets (Pen. Code, § 647, subd. (d)) . . . were involved. [¶] Conviction of such offenses would have resulted in the mandatory revocation of all diplomas and life certificates issued by the State Board of Education," citing as authority for the latter statement, sections 12912, 13206 and 13207 among other sections of the Education Code. (At p. 218.)

Adverting to *Stanley,* we likewise perceive that this case was decided upon the same rationale as that adopted in *Hallinan, Lorenz,* and *Morrison.* In *Stanley* the Illinois statutory procedure whereby the unwed father of an illegitimate child is presumed unfit to raise the child on the mother's death and may be deprived of custody without a hearing as to his fitness as a parent, was held to be violative of due process and equal protection. The due process clause was held to be violated because the father was entitled to a hearing on his fitness as a parent before his children were taken away from him, and the equal protection clause was held to be violated because the statutory procedure denied to unwed fathers the hearing on fitness accorded to all other parents whose custody of their children is challenged by the state. The gist of the holding in *Stanley* is that parental unfitness must be established by individualized proof. ■ In the instant case we are not dealing with individualized proof of unfitness but, rather, with the conviction of certain crimes which results in the mandatory revocation of a teacher's credential. In a case like the one before us, the discipline sought to be imposed does not depend upon a specific finding of unfitness to teach, but, rather, on the fact of the conviction of a crime. That conviction can only be attained after a judicial hearing as to whether the defendant is guilty of the offense charged. In the instant case plaintiff was accorded such a hearing and, accordingly, was afforded due process.

■ Directing our attention to the constitutional guaranty of equal protection of the laws, we reiterate certain basic principles: This guarantee means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in like circumstances in their lives, liberty, and property and in their pursuit of happiness. (See *Truax* v. *Corrigan,* 257 U.S. 312, 336-338 [66 L.Ed. 254, 264-266, 42 S.Ct. 124, 27 A.L.R. 375]; *Kentucky Co* v. *Paramount Exch.,* 262 U.S. 544, 550 [67 L.Ed. 1112, 1115, 43 S.Ct. 636]; *Gray* v. *Whitmore,* 17 Cal.App.3d 1, 21 [94 Cal.Rptr. 904]; *People* v. *Jacobs,* 27 Cal.App.3d 246, 258 [103 Cal.Rptr. 536].) "The concept of the equal protection of the laws compels recognition of the proposition that persons similarly situated with respect to the legitimate purpose of the law receive like treatment." (*Purdy & Fitzpatrick* v. *State of California,* 71 Cal.2d 566, 578 [79 Cal. Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].) As we observed in *Gray,*

"This concept does not, however, require absolute equality [citations] or that a statute necessarily apply equally to all persons [citations]; rather, it permits a state to provide for differences so long as the result does not amount to an invidious discrimination. [Citations.]" (17 Cal.App.3d at pp. 21-22.)

Recently, the Supreme Court, in *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 16 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], observed that before deciding whether a statute violates the equal protection clauses of the state and federal Constitutions a reviewing court must determine the proper standards for reviewing the classification which the statute creates. In cases involving "suspect classifications" or touching on "fundamental interests" the classification bears close scrutiny and the state has the burden of establishing that it has a *compelling* interest which justifies the law and that the distinctions drawn by the law are necessary to further its purpose. (*Sail'er Inn, Inc.* v. *Kirby, supra,* at pp. 16-17; *Westbrook* v. *Mihaly,* 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].) ▆▆ Under these principles the instant case is governed by the strict scrutiny standard because the statute limits the fundamental right of one class of persons to pursue a lawful profession. (*Sail'er Inn, Inc.* v. *Kirby, supra,* at p. 17.)

▆▆ Purifoy asserts that no compelling state interest has been demonstrated by the board and that no compelling interest for denying him a hearing suggests itself. We dispose of this contention by reiterating that such an interest has been recognized by *DiGenova* wherein it is pointed out that "teachers convicted of sex offenses should be promptly removed from the classroom and contact with students." (45 Cal.2d at p. 259.) Such compelling interest was also acknowledged in *Vogulkin* v. *State Board of Education,* 194 Cal.App.2d 424 [15 Cal.Rptr. 335].[5]

In *Vogulkin,* a case involving section 13130 providing for the mandatory denial of the application or renewal of a teaching credential of an applicant who has been determined to be a sexual psychopath, or has been convicted of any sex offense as defined in section 12912 or a narcotics offense as defined in section 12912.5,[6] the reviewing court observed that there is a presumption in favor of the classification based upon legislative experience. (194 Cal.App.2d at p. 429.) "By education, experience, study and research, certain areas of human activity, if participated in, may

[5]A petition for a hearing by the Supreme Court was denied.

[6]*Vogulkin* observes that there is no distinction between sections 13207 and 13130 since both use the same terminology, and that the interpretation given in the *DiGenova* case prevails in both situations. (194 Cal.App.2d at p. 429.)

be such that no further right should exist in the person to be a member of a teaching profession whereas others may be of such nature the person so acting may be rehabilitated and no longer a menace in their contact with the school children. The Legislature having made a lengthy study of the problem before the enactment of the code sections herein involved has drawn a distinction between certain crimes. It is not for the courts to lightly disregard the classifications or to declare them discriminatory or to find they do not afford equal protection to all within the class designated." (*Vogulkin* v. *State Board of Education, supra,* at p. 430.) Accordingly, in *Vogulkin* the classification made by the Legislature between the types of the offenses involved was held not to be arbitrary. (At pp. 429-433.)

In *Adler* v. *Board of Education,* 342 U.S. 485, 493 [96 L.Ed. 517, 524, 72 S.Ct. 380, 27 A.L.R.2d 472], we find the following pertinent observation: "A teacher works in a sensitive area in a schoolroom. There he shapes the attitude of young minds towards the society in which they live. In this, the state has a vital concern. It must preserve the integrity of the schools. That the school authorities have the right and the duty to screen the officials, teachers, and employees *as to their fitness to maintain the integrity of the schools* as a part of ordered society, cannot be doubted." (Italics added.) In this context it may properly be asserted that there is a difference between a teacher's fitness to maintain the integrity of the school and the concept of fitness to teach in the academic sense articulated in *Morrison.*

In the light of the foregoing, the differences asserted by Purifoy do not amount to invidious discrimination. We observe, initially, that persons convicted of the sex offenses described in sections 13207 and 12912 are treated alike. We next observe that the persons described in section 13207 and those entitled to an administrative hearing (§§ 13202, 13209, 13403) are not in like circumstances. Section 13207 applies to persons who have been *convicted* of certain sex offenses. Such persons constitute a class which the Legislature identified as constituting a dangerous element in the school community and which in its discretion it put under appropriate control. On the other hand, the harm resulting from noncriminal sexual misconduct or other sexual misconduct has apparently been deemed by the Legislature to be of a lesser degree, since discipline for such conduct results only if, after a hearing, it is found to be "immoral," "unprofessional" or involving "moral turpitude." (§§ 13202, 13129, subd. (e).) The Legislature is free to recognize degrees of harm and it may confine its restrictions to those classes of cases where the need is deemed to be the clearest. (*Minnesota* v. *Probate Court,* 309 U.S. 270, 274-275 [84 L.Ed. 744, 749-750, 60 S.Ct. 523, 126 A.L.R. 530]; *Werner* v. *Southern Cal.*

*etc. Newspapers,* 35 Cal.2d 121, 132 [216 P.2d 825, 13 A.L.R.2d 252].) In sum, the distinction made by section 13207 acts uniformly upon the whole of a single class of individuals, even though the selected group is a part of a larger class. The classification, therefore, is a natural and intrinsic distinction which cannot be objected to on constitutional grounds. (*Minnesota* v. *Probate Court, supra.*)

The order and judgment are affirmed.

Sims, J., and Elkington, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 29, 1973.