[Civ. No. 52739. Second Dist., Div. Five. Nov. 30, 1978.]

LEON OVERTURF, Plaintiff and Appellant;
GERALD YEUTTER et al., Plaintiffs and Respondents, v.
CALIFORNIA HORSE RACING BOARD, Defendant and Appellant.

## COUNSEL

Morris J. Kushner for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and Marilyn K. Mayer, Deputy Attorney General, for Defendant and Appellant.

Franklin D. Laven for Plaintiff and Respondent.

## OPINION

**HASTINGS, J.**—This is an appeal from a superior court judgment granting a writ of mandate as to respondents Yeutter and Griffiths and denying the petition for writ of mandate as to appellant Overturf. On July 22, 1976, an administrative law judge issued a proposed decision finding that cause existed for disciplinary action against Overturf, Griffiths, and Yeutter, but that no public purpose would be achieved by imposing discipline. The California Horse Racing Board considered the proposed decision, but declined to accept it. On February 25, 1977, the board found cause for disciplinary action existed against Overturf, Yeutter, and Griffiths,[1] and the licenses of all three were revoked. In the case of Overturf, the revocation was stayed and the license was placed on probation for one year. The revocation of Griffiths' and Yeutter's licenses was also stayed, and the licenses were placed on probation for three years. The conditions of probation were that respondents must obey all laws, rules and regulations.

In a minute order the trial court gave its reasons for granting the writ of mandate as to Yeutter and Griffiths. It reads as follows: "No doubt respondent could, in the exercise of its broad powers, have adopted rules or regulations which would make impermissible the conduct shown here on the part of petitioners Yeutter and Griffiths as pari-mutuel employees.

---

[1]Disciplinary action was ordered pursuant to title 4 of the Administrative Code, sections 1950 and 1969, and Business and Professions Code, sections 19590, 19593, and 19595.

However it did not, as the only such rule assertedly violated is Rule 1969 (Title IV, Cal. Adm. Code), which provides that 'No . . . pari-mutuel employee . . ., *while on duty at a race meeting,* shall *wager* on the results of a race.' The key to the differences between the court's conclusion and that urged by respondent is the proper interpretation to be placed on the word 'wager.' To the court, both the dictionary definition and that of common usage is that one can 'wager' only with his own funds. By delivering another's bet to the pari-mutual window, one can place someone else's wager, but that has not been forbidden by respondent's rule, and that does not make it a wager of the person making the delivery."

The California Horse Racing Board appeals from the judgment granting a writ of mandate to Yeutter and Griffiths. Overturf cross-appeals from the judgment denying his petition for writ of mandate.

## FACTS

In 1972, the California Horse Racing Board and later federal authorities undertook an investigation of suspected bookmaking activities among pari-mutuel employees at various California race tracks. From the investigations it was determined that Overturf, Griffiths, and Yeutter had bet on horses while on duty, or were aiding in wagering operations. There was also information that Overturf was taking sports action on football games and other sports events.

At the administrative hearing held before the California Horse Racing Board it was stipulated that approximately two-thirds of the pari-mutuel employees were engaging in wagering in violation of the Racing Board Rules at various times. George Haines, manager of the mutuels at Hollywood Park Turf Club at the Santa Anita Race Track, testified that he had his men personally suspend clerks for one day when they were caught betting. The action was taken through the union working rules and a report was not made to the California Horse Racing Board.

Ronald Liccardo testified that he was a pari-mutuel employee at the Hollywood Park race track in 1971 and 1972, and also worked at the Oak Tree Race Meet at Santa Anita Park. Liccardo, a cashier, gave money to respondent Griffiths on at least a dozen occasions to bet for him during the Hollywood Park 1972 meeting. Griffiths was a runner. As such he was to bring money on the cashier's order, send the tickets down to the money room, and take care of the clerk's needs. Liccardo would tell Griffiths

which horse to bet on and Griffiths would sometimes bring him the pari-mutuel tickets. On many occasions Liccardo did not receive tickets but only the money won. Liccardo never saw Griffiths purchase any tickets for him. Liccardo was on the upper mezzanine and could not see the selling window section downstairs.

It was stipulated that if Mr. Chila and Mr. Johnson were to testify, their testimony would be essentially the same as Mr. Liccardo's with respect to Griffiths. It was also stipulated that if Mr. Blatz and Mr. Harvey were to testify, their testimony would be essentially the same as that given by Mr. Liccardo, but that their contact was solely with Yeutter.

It was further stipulated that Joseph Sani, a ticket checker at the Hollywood Park Meet in 1972, received a card from respondent Griffiths with daily double combinations thereon two or three times a week for a number of weeks. The cards were to be given to their supervisor Jack Cassidy. At the time Sani received the daily double combinations he did not receive any money from Griffiths. This occurred before the first race in the ticket room. On other occasions Griffiths gave exacta cards to Sani before the fifth and ninth races. No money exchanged hands on these occasions, but Griffiths would give Sani bills to turn over to Cassidy.

Regarding appellant Overturf, it was stipulated that if James Young were to testify, his testimony would be essentially the same as that given by Mr. Liccardo, but relating solely to Overturf. James Ahern, an investigator for the Horse Racing Board, testified that Overturf admitted knowing about the situation at the track and admitted that he had made bets while on duty. He told Ahern he thought 90 percent of the men made bets. Overturf stated he bet $20 to $50 per day while on duty.

Griffiths, Yeutter, and Overturf all took the stand and took the Fifth Amendment with respect to whether or not they bet while on duty as alleged in the Accusations.

### DISCUSSION

■ 1. The first issue on appeal is the interpretation to be given to the word "wager" as used in the Business and Professions Code, and especially in section 1969, title 4 of the Administrative Code.[2] Respondents Yeutter and Griffiths contend that the superior court was correct in

---

[2]Section 1969 reads: "No . . . pari-mutuel employee . . . while on duty at a race meeting, shall wager on the result of a race."

basing its opinion on the conclusion that one can wager only with one's own funds. Delivering another's bet to the pari-mutuel window under this theory would not be wagering. We find this argument unpersuasive.

The verb "wager" as defined by Webster's Dictionary is "to make a bet" or "lay a wager." The noun "wager" means "something (as a sum of money) that is risked on an uncertain event." Neither the dictionary nor common usage restricts the meaning of wager to the use of one's own funds. We conclude it means one's own funds or the funds of another. The interpretation of "wager" urged by respondents would permit pari-mutuel employees to easily circumvent the purpose of the California Horse Racing Board's rule that is designed to stop an improper and dangerous practice by employees on duty. Under such an interpretation, employees could freely bet while on duty by simply agreeing between themselves that each would place the bets of the other. In the case at bar, the superior court erred in granting a writ of mandate to respondents Griffiths and Yeutter on the ground that they were not wagering.

■ 2. Appellant Overturf contends the board abused its discretion in revoking his license. We disagree. The penalty imposed upon Overturf was clearly not excessive. Under sections 19440 and 19562 of the Business and Professions Code, the Legislature has granted the board the exclusive authority to prescribe the rules, regulations, and conditions under which horse racing and wagering on the results shall be conducted in this state. Under section 19461, the board has the power to revoke and suspend every license granted under the chapter where the board has reason to believe any law or regulation of the board has been broken or violated. Overturf admitted to James Ahern that he had made bets while on duty. Although his license was revoked, the revocation was stayed and the license placed on probation for one year. The conditions of the probation were only that he obey the laws of California and the rules and regulations of the California Horse Racing Board.

■ 3. Appellant Overturf next argues that he was denied equal protection of the law in that he was singled out for violating a regulation which probably 90 percent of pari-mutuel employees had violated: therefore, he was a victim of purposeful discrimination by the board.

Equal protection of the law means that no person or class of persons shall be denied the same protection of laws which is enjoyed by other persons or other classes, in like circumstances, in their lives, liberty, property, and in their pursuit of happiness. ■ The courts have stated

though: " 'This concept does not, . . . require absolute equality [citations] . . .; rather, it permits a state to provide for differences so long as the result does not amount to an invidious discrimination. [Citations.]' ([*Gray v. Whitmore*], 17 Cal.App.3d [1] at pp. 21-22 [94 Cal.Rptr. 904].)" (*Purifoy v. State Board of Education,* 30 Cal.App.3d 187, 196 [106 Cal.Rptr. 201].)

■ In this case, appellant was not chosen because of an invidious class discrimination such as race, color, creed, union membership, or any other. Appellant was prosecuted due to the fact that he was caught up in an intensive investigation having to do with a bookmaking ring taking place at various tracks. The fact that other mutuel clerks were not caught betting while on duty is not a reason to overthrow this case on the grounds of selective enforcement.

If a person alleges that he has been discriminatorily picked out, he must demonstrate that he has been deliberately singled out for prosecution on the basis of some invidious criterion.

" 'It is . . . clear that mere errors of judgment by officials will not support a claim of discrimination. *There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical* uniformity.' (Italics added.) [Citation.] ■ The Supreme Court reiterated this doctrinal precept in *Snowden* v. *Hughes* (1944) 321 U.S. 1, 8 [88 L.Ed. 497, 503, 64 S.Ct. 397]: 'The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless there is shown to be present in it an element of intentional or purposeful discrimination.*' (Italics added.)" (*Murgia* v. *Municipal Court,* 15 Cal.3d 286, 297 [124 Cal.Rptr. 204, 540 P.2d 44].)

In *Murgia,* the court dealt with the prosecution of only members of a certain union and a denial of discovery to such members. In discussing the history of the equal protection clause and discriminatory enforcement, it stated at page 296: ". . . allegedly 'unequal' treatment which may result from simple *laxity of enforcement* or the *nonarbitrary* selective enforcement of a statute has never been considered a denial of equal protection." (Italics in original.) The court went on to state (p. 297) that the equal protection guarantee simply prohibits officials from purposely and intentionally singling out persons for disparate treatment on an invidiously discriminatory basis. Such doctrine is not to be used to insulate particular law-breakers from prosecution.

And finally on this point the *Murgia* court, quoting *Oyler* v. *Boles,* 368 U.S. 448 [7 L.Ed.2d 446, 82 S.Ct. 501], stated at page 299: " '[T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged.' " The same is true here, and Overturf has not demonstrated that he was the victim of arbitrary selective enforcement on an invidious basis.

■ Overturf's last argument, that the independent judgment test governs, is also incorrect. It has been held by the California Supreme Court that the California Horse Racing Board is in a different category than most other administrative agencies because its power is derived from the California Constitution. (*So. Cal. Jockey Club* v. *Cal. etc. Racing Bd.,* 36 Cal.2d 167, 170-171 [223 P.2d 1], *Sandstrom* v. *Cal. Horse Racing Board,* 31 Cal.2d 401, 413 [189 P.2d 17, 3 A.L.R.2d 90].)

The judgment granting the writ of mandate to respondents Yeutter and Griffiths is reversed. The judgment denying the writ of mandate to appellant Overturf is affirmed.

Stephens, Acting P. J., and Ashby, J., concurred.