[Civ. No. 62261. Second Dist., Div. Three. July 1, 1982.]

DARRELL J. VIENNA, Plaintiff and Appellant, v. CALIFORNIA HORSE RACING BOARD, Defendant and Respondent.

COUNSEL

Brown, Weston & Sarno, David M. Brown, Gibson, Dunn & Crutcher, Robert Forgnone and Richard P. Levy for Plaintiff and Appellant.

George Deukmejian, Attorney General, and Marilyn K. Mayer, Deputy Attorney General, for Defendant and Respondent.

OPINION

DANIELSON, J.—This is an appeal from a judgment denying a writ of mandate sought by petitioner Darrell J. Vienna to set aside a decision of the California Horse Racing Board, sustaining an accusation against Vienna under section 1887, title 4, of the California Administrative Code,[1] imposing a fine of $2,000, and disqualifying the horse Armorica from second place in a race.[2] (See Code Civ. Proc., § 1094.5.)

PROCEDURAL HISTORY

On January 22, 1978, the California Horse Racing Board (hereinafter Board) issued an order suspending Vienna's license as trainer, pending a hearing. On January 30, 1978, Vienna requested a formal hearing pursuant to Business and Professions Code section 19461.

An accusation was filed alleging that Vienna had violated sections 1489, subdivisions (f) and (i), 1845, and 1887. A hearing was held be-

---

[1]Unless otherwise indicated all references to rule or sections are to chapter 4 of title 4, California Administrative Code, the rules of the California Horse Racing Board.

[2]The notice of appeal states that it is from the minute order denying the writ, which is not an appealable order, but we deem the notice of appeal to have been a premature but valid notice of appeal from the judgment entered December 3, 1980, discharging the alternative writ of mandate and denying the writ petition.

fore an administrative law judge, who rendered a proposed decision finding that no cause existed to suspend or revoke Vienna's licenses as a trainer and horse owner and dismissing the accusation. The Board rejected the proposed decision, and, after reviewing the case upon the record of proceedings, and receiving written and oral arguments, rendered its decision on August 24, 1979, effective September 24, 1979.

The Board found (1) that the presence of procaine in the urine sample of Armorica was "positive" within the meaning of section 1887, but (2) that "[i]t was not established that the respondent [Vienna] did administer, or caused to be administered, the drug Procaine" within 60 hours before the race and accordingly, that Vienna "did not violate the provisions of . . . section 1845(a) relating to 'Prohibited Drugs.'" The Board ordered Vienna to pay a fine of $2,000 for the violation of section 1888, subdivision (c). The Board also disqualified the horse Armorica from second place in a race and ordered that the earnings of the horse be redistributed in accordance with the revised order of finish.

On November 2, 1979, Vienna filed a petition for writ of mandamus in the superior court, which the court denied after reviewing the administrative proceeding.

FACTS

The superior court reviewed the record which was before the Board, applying the substantial evidence test. (See *Overturf* v. *California Horse Racing Bd.* (1978) 86 Cal.App.3d 979, 986 [150 Cal.Rptr. 657].) The following evidence was before the Board when it rendered its decision.

Vienna is licensed as a trainer and horse owner by the Board. On January 19, 1978, Vienna was the trainer and part-owner of Armorica, a horse in his care, which finished second in the third race at Santa Anita. The postrace urine sample of Armorica, taken immediately following the race, was analyzed by a recognized laboratory and showed the positive presence of 3.8 micrograms of procaine per milliliter of urine. Procaine is both a stimulant and an anesthetic. Armorica was known to have a sore knee problem and had been treated for soreness prior to January 19, 1978. Procaine hydrochloride is used for problems of lameness in a horse.

The finding of 3.8 micrograms of procaine per milliliter of urine was as large an amount as the chemist had ever found in his 21 years as chief racing chemist for the Board. The quantity of procaine was so large that it went above the chart in the spectrophotometer test and the sample had to be diluted five times in order to be able to get it on the laboratory's chart. In the chemist's opinion, with the 3.8 microgram reading, the horse would have been given procaine hydrochloride between two and four hours before the race. The state veterinarian for the Board testified that, in his opinion, based on the 3.8 reading, the horse Armorica had received procaine within 24 hours of the race.

## CONTENTIONS

Vienna makes the following contentions on appeal.

1. "The Board's decision that Vienna had violated section 1887, but not section 1845(a), is based upon an erroneous construction of the term, a 'positive' urine sample."

2. "The decision must be set aside because the Board failed to find whether or not Vienna established the defense to section 1887 contained in section 1888 (c)."

## DISCUSSION

### THE RACING BOARD'S FINDING THAT APPELLANT VIOLATED THE TRAINER-INSURER RULE BUT DID NOT VIOLATE THE RULE PROHIBITING THE ADMINISTRATION OF CERTAIN DRUGS WITHIN 60 HOURS BEFORE A RACE IS NOT INCONSISTENT AND IS NOT BASED UPON AN ERRONEOUS INTERPRETATION OF THE TERM "POSITIVE"

Rules 1845 and 1887, on January 19, 1978, read as follows: "Article 15. Veterinary Practices [Sections 1840 through 1865, inclusive]

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .

"1845. *Prohibited Drugs.* Any drug recognized as a stimulant, depressant, narcotic or local anesthetic is a prohibited drug.

"(a) No person shall administer a prohibited drug to any horse entered to race, and no horse shall be permitted to start in any race for a period of not less than 60 hours after administration of any prohibited drug to the horse.

"(b) Should the chemical or other analysis of urine, saliva, blood or other required test of a horse prove positive showing the presence of any prohibited drug in the test sample, the horse shall be disqualified from the race, shall forfeit any purse or award for such race, and, unless the Board orders otherwise, shall be ineligible to start in any future race until it is demonstrated that the horse is able to compete in races without the aid of any prohibited drug."

". . . . . . . . . . . . . . . .

"Article 16. General Conduct [Sections 1870 through 1904, inclusive]

". . . . . . . . . . . . . . . .

"1887. *Trainer to Insure Condition of Horse.* The trainer shall be the absolute insurer of and responsible for the condition of the horses entered in a race, regardless of the acts of third parties, except as otherwise provided in this article. Should the chemical or other analysis of urine or saliva samples, or other tests, prove positive showing the presence of any narcotic, stimulant, depressant or local anesthetic, the trainer of the horse may be fined, his license suspended or revoked, or be ruled off; and, in addition, the owner of the horse, the foreman in charge of the horse, the groom, and any other person shown to have had the care or attendance of the horse may be fined, his license suspended, revoked, or be ruled off."

As a stimulant and anesthetic, procaine is included within the meaning of "prohibited drug" in rule 1845, subdivision (a) and is also included within rule 1887 as a stimulant and an anesthetic.

Appellant contends that the Board erred in finding that he violated rule 1887 while finding, upon the same facts, that he did not violate rule 1845, subdivision (a). He bases his contention upon the assertion that a violation of rule 1887 is dependent upon a violation of 1845, subdivision (a) since violations of the two rules require the same

proof. Therefore, he contends that a finding of "no violation" of 1845, subdivision (a) compels a finding of "no violation" of rule 1887.

Appellant concedes that there are no reported decisions in point, but he advances several arguments in support of his contention.

The essence of appellant's argument is that proof by chemical or other analysis of the presence of procaine in the post race urine sample of a horse does not mean that the sample has proved "positive" for the presence of procaine within the meaning of rule 1887, the so-called "trainer-insurer" rule, but rather, that it is necessary to establish that the drug was administered to the horse within 60 hours prior to the race. There is nothing in the rules themselves to support that contention. Appellant's argument is fallacious. The 60-hour factor appears only in rule 1845, subdivision (a); the term "positive" appears only in rule 1845, subdivision (b) and in rule 1887. Thus rules 1845, subdivision (b) and 1887 use the same standard, but that standard has nothing to do with rule 1845, subdivision (a).

Appellant points out that the Board's decision that he violated rule 1887, but did not violate rule 1845, subdivision (a), shows that the Board construed the term "positive," as used in rule 1887, to mean that the presence of procaine in the post race urine sample is a violation of rule 1887, although not of rule 1845, subdivision (a). This assertion is correct, but it neither compels nor permits the conclusion that violations of the two rules require the same proof.

## RULE 1887 IS NOT A "MEDICATION" RULE

Appellant then argues that rules 1887 and 1845 are both "medication" rules and that in order that rules for the medication of race horses may be "harmonized," it is necessary to construe the term "positive" in rule 1887 to mean that the drug was administered to the horse less than 60 hours before the race.

However, rule 1845 is a part of article 15 of the rules of the Board, which governs "Veterinary Practices," while rule 1887 is a part of article 16, which governs the "General Conduct" of licensees of the Board and sets forth many of their responsibilities and duties. As we shall show further, below, there is no logical basis for importing the "medication" requirements of rule 1845, subdivision (a) into rule 1887.

## RULES 1845 and 1887 OF THE CALIFORNIA HORSE RACING BOARD ARE BOTH SUBSTANTIVE RULES

Appellant next argues that rules 1845 and 1887 must be read together because rule 1845 is substantive while rule 1887 is procedural. The thrust of this contention is that rule 1887 cannot stand alone, but is dependent upon rule 1845 for the meaning of the term "positive."

This contention is without merit.

Black's Law Dictionary, Fifth Edition, defines "substantive" as, "An essential part or constituent or relating to what is essential" (p. 1281), and explains the difference between "procedural laws" and "substantive laws" as follows: "As a general rule, laws which fix duties, establish rights and responsibilities among and for persons, natural or otherwise, are 'substantive laws' in character, while those which merely prescribe the manner in which such rights and responsibilities may be exercised and enforced in a court are 'procedural laws'." (See Black's Law Dict. (5th ed. 1979) p. 1083, col. 2.)

Our Supreme Court has said: ""Substance" and "procedure" . . . are not legal concepts of invariable content' [citations], and a statute or other rule of law will be characterized as substantive or procedural according to the nature of the problem for which a characterization must be made." (*Grant* v. *McAuliffe* (1953) 41 Cal.2d 859, 865 [264 P.2d 944, 42 A.L.R.2d 1162].)

Rule 1887 fixes duties and establishes responsibilities for licensees of the Board, including horse trainers, and thus is substantive law. The same is true of rule 1845. The duties and responsibilities fixed upon the trainer by rule 1887 are the basis of this case. Rule 1887 makes the trainer the absolute insurer of the condition of the horses entered in a race.

We find that each of rules 1845 and 1887 has substantive qualities and that neither is dependent on the other by reason of being substantive or procedural.

### RULES 1845 and 1887 ADDRESS DIFFERENT RESPONSIBILITIES AND ARE INDEPENDENT

Because of the issues raised in this appeal, it is well to note that rules 1887 and 1845 address different aspects of the Board's statutory re-

sponsibility. (See Bus. & Prof. Code, §§ 19401, 19420, 19440 and 19562.)

Both rules are directed at protecting the public interest and insuring the integrity of the horse racing and parimutuel wagering system. However, as we have noted above, rule 1887 governs the "general conduct" of the Board's licensees, while rule 1845, especially 1845, subdivision (a), governs "veterinary practices."

The racing industry greatly affects the public interest.

In California, horse racing and parimutuel wagering attract large followings and vast sums of money. The people of the State of California participate in the revenues from wagering as well as in the wagering itself. Parimutuel wagering generates public revenues.

Parimutuel wagers in California in 1978 totalled $1,516,305,623 and 1981 they totalled $2,053,305,806 Revenue to the State of California from such wagers was $110,841,029 in the fiscal year ending June 30, 1978, and reached $130,341,528 in fiscal year 1981. (Annual Reports of the California State Comptroller.)

Our Supreme Court has said: "Rule 313 [now rule 1887] is *designed to afford the wagering public a maximum of protection* against race horses being stimulated or depressed by making the trainer the insurer of the horse's condition. That the wagering public merits such protection is evident from the magnitude of its patronage.... Should responsibility be imposed only for actual guilty participation or culpable negligence, ... there would exist a possible field of activity beyond the affirmative protection thereby afforded to patrons of the pari-mutuel system. Remedial action subsequent to the pay-off ... may in some instances be effective as between *competitors for the purse money.* Such action may constitute a delay in payment of the prize money until the determination of the saliva, urine or other test.... The recognized interest of the wagering patrons is sought to be safeguarded by rule 313 [now rule 1887]. In most instances the very existence of the condemned activities creates a nonremedial situation. Detection of the condition may not be possible until long after the race has been run and the parimutuel winners paid off. The closer the supervision to which the trainer is held, the more difficult it becomes for anyone to administer a drug or chemical to the horse. The exaction of the ultimate in that regard is justified by the peril to be avoided. 'Legislation for regulatory

purposes, which dispenses with the condition of awareness of wrongdoing and places the burden of acting at his peril on a person otherwise innocent "but standing in personal relation to a public danger" . . . is a traditional means of regulation.' (*People v. Scott*, 24 Cal.2d 774, 782 [151 P.2d 517].) [¶] . . . By express language the rule imposes strict liability for the condition of the horse. Fault in the sense of actual administration of the drug or negligent care by the trainer is neither the basis nor an element of liability. It may not be injected into the case by way of subtle hypothesis. Whether the trainer drugged the horse or knew that it was drugged, or was negligent in not properly seeing that the horse was not drugged are not elements of liability." (Italics added.) (*Sandstrom v. Cal. Horse Racing Board* (1948) 31 Cal.2d 401, 408-409 [189 P.2d 17, 3 A.L.R.2d 90].)

In a separate concurring opinion, Justice Schauer directly addressed the question of whether the trainer-insurer rule is unduly harsh, saying: "I concur. While at first thought the rule which we uphold appears to be a harsh one I am persuaded that upon reflection its seeming harshness largely disappears and its justice become manifest. The effect of the decision simply is that a trainer is held penally responsible on his warranty that a horse entered by him in a race has not been 'doped.' [¶] That the public are entitled to protection against the practice of drugging race horses is not disputed; that the trainer who has charge of a horse, who undertakes to condition it for a race and who actually enters it in the race and permits it to compete shall be charged with absolute responsibility for its condition seems within the bounds of moral reason and legislative power. Contrary to the suggestion which has been made in argument the trainer is not defenselessly liable to punishment for the act of another person; he is liable only for his own act or omission; i.e., causing or permitting a horse warranted by him to be free from drugs to participate in a race while drugged. [¶] The trainer can protect himself by protecting the horse and by checking its condition at the last reasonably possible moment before the race. If he finds that despite his earlier care the horse has been drugged he must, of course, withdraw it from the contest; from the time of the last condition check until the race it is not unreasonable that the trainer shall be held to the responsibility of either so guarding the animal as to preclude its being drugged or of withdrawing it from the race." (*Id.* at pp. 413-414; see also *Jones v. Superior Court* (1981) 114 Cal.App.3d 725, 730 [170 Cal.Rptr. 837].)

### RULE 1845 (a) IS NOT SURPLUSAGE TO RULE 1887

Appellant contends that if the mere presence of procaine in a post race urine sample is a substantive violation of rule 1887, then rule 1845, subdivision (a) is rendered mere surplusage, since the rules would be violated by the mere presence of the "prohibited drug" in the post race urine sample, regardless of whether the drug was administered more or less than 60 hours before the race.

Rule 1845, subdivision (a) has nothing to do with post race urine samples. The only reference to post race urine samples in rule 1845 is made in rule 1845, subdivision (b), which disqualifies a horse from the race if its urine sample shows the presence of any prohibited drug.

While not a model of legislative draftsmanship, rule 1845 is not ambiguous or confusing. It has the following four objectives:

1. It declares certain drugs to be "prohibited drugs";

2. It prohibits the administration of a "prohibited drug" to any horse entered to race;

3. It prohibits permitting a horse to start in any race within 60 hours after the administration of a "prohibited drug" to that horse; and

4. If the analysis of the urine or other test of a horse should "prove positive" showing the presence of any "prohibited drug" in the test sample, it disqualifies that horse from the race and forfeits any purse or award.

Rather than being surplusage rule 1845, subdivision (a) serves the very important function of regulating the administration of the prohibited drugs under the direction of veterinarians licensed by the Board.

### THE PRESENCE OF A PROHIBITED DRUG IN THE TEST SAMPLE OF A HORSE IS A VIOLATION OF RULE 1845 (b) AND OF RULE 1887

Appellant next contends that under rule 1845, "prohibited drugs" are entirely permissible as long as they are administered more than 60 hours before a race.

That argument is true as to rule 1845, subdivision (a), but it does not eliminate, and does not lessen, the sanctions of rule 1845, subdivision (b), which disqualify a horse from the race, forfeit its purse or award and limit its eligibility to start in any future race if the analysis of the urine or other required test proves positive showing the presence of a prohibited drug in the test sample. Likewise, that argument has no application to the sanctions of rule 1887. The 60-hour time limit of rule 1845, subdivision (a) does not prohibit sanctions for the presence of a prohibited drug in the post race urine sample; it does not apply to either rule 1887 or rule 1845, subdivision (b).

### The Term "Positive" as Used in Both Rules 1845(b) and 1887 Means a Showing of the Presence of the Named Substance in the Test Sample to a Measurable Degree Upon Scientific Testing

Appellant contends that the term "positive," in rules 1845, subdivision (b) and 1887, should be construed in the same way in each rule. We find that the Board so construed the term, and that such a construction was correct.

█ The term "positive," as used in sections 1845, subdivision (b) and 1887, requires a showing of the presence of the prohibited or named substances in the test samples, to a measurable degree and subject to scientific verification.

The requirements of the rules are met when a positive scientific test result is shown.

### The Board's Decision That There Was No Violation of Rule 1845 (a) Does Not Mean That the Horse Did Not Receive Procaine From Some Source

Appellant next contends that in the absence of a finding that Armorica had received procaine within 60 hours before the race, it was error for the Board to find that there was a violation of section 1887. He bases that contention on findings of fact "V" and "VI" in the Board's decision, which read as follows:

## "V

"It was established that respondent violated provisions of the Administrative Code as alleged in the accusation, in that it is found that the presence of the drug Procaine in the urine sample taken from 'Armorica' on January 19, 1978, immediately after the third race at Santa Anita was a 'positive' within the meaning of Title 4, California Administrative Code section 1887.

## "VI

"It was not established that the respondent did administer, or cause to be administered, the drug Procaine in any form to the horse 'Armorica' at any time within 60 hours of the third race on January 19, 1978, and accordingly, respondent did not violate the provisions of Title 4, California Administrative Code section 1845(a) relating to 'Prohibited Drugs.'"

Appellant's argument is that finding VI means that the horse Armorica did not receive procaine in some form less than 60 hours before the race. The above contention is clearly without merit. Findings V and VI are not in conflict. Finding VI means only that the Board found that it was not established that Vienna himself administered procaine or caused it to be administered within 60 hours of the race. The finding on that point goes no farther. It does not find that Armorica did not receive procaine from some source, and finding V is that procaine was present in the urine sample in violation of rule 1887.

■ "Fault in the sense of actual administration of the drug or negligent care by the trainer is neither the basis nor an element of liability" under the trainer-insurer rule. (*Sandstrom* v. *Cal. Horse Racing Board, supra*, 31 Cal.2d at p. 409; *Jones* v. *Superior Court, supra*, 114 Cal. App.3d at p. 730.)

### The Board Did Not Err in Not Expressly Finding Whether Appellant Established the Defense to Rule 1887 Contained in Rule 1888(c)

■ Appellant's second contention is that the decision must be set aside because the Board failed to find whether Vienna had established the defense to rule 1887 contained in rule 1888, subdivision (c).

This contention is without merit.

Rule 1888 provides: "*Defense to Trainer Insurer Rule.* A trainer or other person charged with a violation of Section 1887 may defend, mitigate or appeal the charge if:

".            .       .        .         .         .        .        .         .        .       .             .      .     .

(c) He shows, by a preponderance of evidence, that he made every reasonable effort to protect the horses in his care from tampering by unauthorized persons";

The issue before the Board as to the violation of rule 1887 was whether the postrace urine sample of Armorica proved positive for the presence of procaine. As to that issue, the Board explicity found a violation. The record is replete with substantial and uncontradicted evidence that Armorica's sample did in fact prove positive.

It was not necessary that the Board find expressly that Vienna had not established the affirmative defense of rule 1888, subdivision (c). No such finding is essential to the imposition of liability by way of a fine for violation of rule 1887. (See *Sandstrom v. Cal. Horse Racing Board, supra,* 31 Cal.2d at p. 412.) The issue before the Board on this defense was whether Vienna had failed to take reasonable precautions against tampering by unauthorized persons. The burden was on Vienna to establish that defense, and he failed to meet this burden.

Absent a statute to the contrary, findings on matters of mitigation are not required. (*Otash v. Bureau of Private Investigators* (1964) 230 Cal.App.2d 568, 574-575 [41 Cal.Rptr. 263].)

That the Board considered Vienna's evidence in mitigation is apparent from the decision which limited the penalty to a fine of $2,000, and did not suspend or revoke his licenses.

## DISPOSITION

The judgment appealed from is affirmed.

Lui, Acting P. J., and Potter, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 25, 1982.